Freeholders of Middlesex Co. *v.* State Bank at New Brunswick.

let me ask, When did any wrong-doer ever yet possess the hardihood to plead, in aid of his escape from justice, the extreme difficulties he had contrived to throw in the way of pursuit and detection, saying, you had better not make the attempt, for you will find I have made the search very troublesome? The answer is, the court will try."

In the light of the facts in this case, and of the legal and equitable principles expressed by the authorities cited, the injunction and receivership, directed by the chancellor in the early stages of this suit, are seen to have been the appropriate and efficient methods of relief. The consequences to the defendant of the abrupt breaking up of his business and the taking possession of his goods by the court, destructive as they may have been of his seemingly great and rapid prosperity, are consequences of which he cannot be heard to complain. They were the legitimate end of his own dishonest practices, long-continued and system-atic, by which the company and its receiver were defrauded of their property, their employes corrupted, involved in criminal guilt and made liable to criminal prosecution.

The decree below, dismissing the bill as to Dringer, should be reversed, with costs, and a decree made in accordance with the foregoing views.

Decree unanimously reversed.

---

THE BOARD OF CHOSEN FREEHOLDERS OF MIDDLESEX COUNTY (George M. Wright, state treasurer, petitioner), appellants,

*v.*

THE STATE BANK AT NEW BRUNSWICK, respondent.

1. New Jersey does not possess the crown's common law prerogative to have its debts paid in preference to the debts of other creditors.

2. On the appointment of a receiver of an insolvent corporation, its title to its property is divested by force of law.

Freeholders of Middlesex Co. *v.* State Bank at New Brunswick.

On appeal from a decree of the vice-chancellor, reported in *Board of Chosen Freeholders of Middlesex Co.* v. *State Bank at New Brunswick*, 2 *Stew.* 268.

A statement of the facts in this case will be found on page 331.

*Mr. Attorney-General Stockton*, for the state.

I. *At common law, the king's debt is preferred.*

" The government was a privileged creditor, under the Roman law, and entitled to priority in the payment of debts. The *cessio bonorum* was made subject to this priority. This is generally the case in all modern bankrupt and insolvent laws. In England, the king's claim is preferred to that of a subject, provided the king's process was commenced before the subject had obtained judgment."    2 *Kent's Com.* 247.

The vice-chancellor, in his opinion, admits that the right of the crown in this particular is clear. He says that " the prerogative has at all times been most loyally upheld by the English courts. It stands on a common law maxim : ' *Quando jus domini regis et subditi concurrunt, jus regis præferri debet.*' Debts due the crown by record, or upon

---

Note.—That the state is a preferred creditor, has been elsewhere decided upon two distinct grounds : (1) By virtue of her sovereignty, and (2) by virtue of the maxim that general words in a statute do not include the state unless expressly named, and hence debts due to the state are not affected by proceedings in bankruptcy, insolvency or assignments for the benefit of creditors.

The preference given to debts due the United States is solely statutory, and "does not stand upon any sovereign prerogative" (*United States* v. *State Bank*, 6 *Pet.* 29, 35, *Story J.*) ; while that of the several states is a branch of the common law of England, adopted as such, or by statutes declaratory thereof. *State of Maryland* v. *Bank of Maryland*, 6 *Gill & J.* 205 ; *Jones* v. *Jones*, 1 *Bland* (*Md.*) 444, 445 ; *Green's Case*, 4 *Md. Ch.* 349, 356 ; *Com.* v. *Lewis*, 6 *Binn.* (*Pa.*) 266, 271 ; *Robinson* v. *Bank of Darien*, 18 *Ga.* 65.

Statutes recognizing and asserting the priority of the state's claims, were passed among the earliest colonial laws. In Maryland in 1650, *Ibid.* 222 ; in Pennsylvania in 1705, *Brackenridge's Misc.* 117.

specialty, are entitled to preference over debts of the same class due to subjects; but simple contract debts due to the crown are not entitled to preference over debts of record due to subjects. *Com. Dig., tit. Adm'r, ch.* 2; *Bac. Abr., tit. Ex'r, L* 2; 2 *Wms. on Ex'rs*, 991. But where both are simple contract debts, that due to the crown must be preferred. *Bac. Abr., tit. Ex'r, L* 2; 2 *Wms. on Ex'rs* 993. The king is supposed to be so constantly engrossed with public business as to be unable to give proper attention to matters relating to his revenue, and, therefore, no time occurs to him, and he is incapable of laches. *Gilbert's Hist. Exch.* 90."

That the right of the king to be first paid was a part of his royal prerogative, has not been disputed.

II. *By the common law, New Jersey became invested with this right, and holds it now.*

The vice-chancellor says: "If, by the adoption of the common law, New Jersey became invested with this right, it holds it now, in all its original force, and may wield it to-day in all its iron rigor. It has not been changed or mitigated by legislation—indeed, it is unknown in the legislation of the state—and if it exists at all, it is held as perfect and complete as it existed in the hands of George III. Statutes regulating private rights, or ameliorating private

---

The priority of the state, in addition to the cases cited in the opinion of the vice-chancellor, has been recognized by other cases in the following states: *Maryland, South Carolina, Georgia, Pennsylvania, Kentucky* and *North Carolina.*

MARYLAND.—In the distribution of an intestate's estate, between the claim of the state on a bond assigned by the intestate and a claim of a bond-debtor of the intestate, who had begun an action on his bond, which was then pending. *State* v. *Rogers*, 2 *Har. & McH.* 198. So, under nearly the same facts, in *Murray* v. *Ridley*, 3 *Har. & McH.* 171.

After the sale of an insolvent decedent's lands for the payment of his debts, deducting from the proceeds the claim of his widow for *dower* and the claims of his judgment creditors, the state was allowed a preference over other unsecured creditors on her claim against the decedent as a defaulting tax collector. *Smith* v. *State*, 5 *Gill* 45.

Upon two judgments rendered on the same day against a county clerk, one for the state, the other for a citizen, that of the state standing first on the docket, is entitled to priority. *Green's Case.* 4 *Md. Ch.*

remedies, do not extend to the king (1 *Bla. Com.* 261), nor to the state (*O'Hanlon* v. *Van Kleeck, Spen.* 31, 40; *S. C.,* 1 *Zab.* 582, 589). When a statute is general, and thereby any prerogative, right, title or interest is divested or taken from the king, in such case the king shall not be bound unless the statute is made to extend to him by express words. *Bac. Abr., tit. Prerog. E* 5. If the right exists here, it is untouched by either constitutional or statutory regulation."

This prerogative, upon the revolution, vested in the people of New Jersey as the sovereign of the country, and is now in their hands.

The power of eminent domain—the foundation of our whole system of internal improvements—is but an incident of sovereignty, and derived from no other source than the clause of the constitution which adopted the common law of England. This right, like the right of dominion and property in the navigable waters, passed from King Charles, as a prerogative right and an incident to regal authority, to the Duke of York, and was embraced in the surrender to Queen Anne. Its possession by us at this day can be traced to no other authority than that prerogative which also embraced the priority of the king's debt.

In *Arnold* v. *Mundy*, 1 *Hal.* 1, Chief Justice Kirkpatrick says, on page 94: " I am of the opinion that, upon the

349; see *Hodges* v. *Mullikin*, 1 *Bland* (*Md.*) 503 ; *Davidson* v. *Clayland*, 1 *Har. & Johns.* 546.

A county clerk made an assignment to secure the sureties on his bond. Both the state and the city of Baltimore presented claims under the assignment for sums due them, respectively, for defaults of the clerk.—*Held*, that those of the state must be first paid. *State* v. *Baltimore*, 10 *Md.* 504.

SOUTH CAROLINA.—In an action against the sureties on an administration bond, they may show that the intestate owed a debt to the state for which the latter held his mortgage, and that the administrator, notwithstanding the mortgage, is entitled to retain the amount of the debt due to the state to the exclusion of other creditors. *Lenoir* v. *Winn*, 4 *Desauss.* 65.

GEORGIA.—Here the preference of the state is placed upon her sovereign right at common law, which was included in a general act of

revolution, all these royal rights became vested in the *people* of New Jersey, as the sovereign of the country, and are now in their hands."

" The right to navigable rivers and arms of the sea was included in the surrender of the proprietors to Queen Anne as a part of the sovereignty, and at the revolution vested in the state." *Gough* v. *Bell*, 1 *Zab.* 156, 2 *Zab.* 441, 3 *Zab.* 624. " When the people of New Jersey took the government into their own hands, the powers of sovereignty, the *prerogatives* and *jura regalia*, which before belonged either to the crown or to parliament, became immediately and rightfully vested in the state." *Bennett* v. *Boggs, Bald. C. C.* 60. Judge Baldwin says "the decision in *Arnold* v. *Mundy* ought to be conclusive."

The opinion of Chief Justice Taney, in *Martin* v. *Waddell*, delivered in 1842, has established indisputably that the *prerogative* and *jura regalia* of the crown are vested in the state of New Jersey, no matter where it may repose in other states. And this arises from the grant of Charles II to the Duke of York, by various deeds and conveyances to the proprietors of East New Jersey, and the surrender to Queen Anne in 1702. The case is reported in 3 *Harr.* 495.

The Chief Justice of the United States says : " The land or soil, under the navigable waters of East New Jersey,

---

the legislature adopting the common law. *Robinson* v. *Bank of Darien*, 18 *Ga.* 65.

PENNSYLVANIA.—It was held that the state " always took preference to individuals until the act of April, 1794, which directs that debts due to the state from deceased persons shall be last paid." *Com.* v. *Lewis*, 6 *Binn.* 266, 271, *Tilghman, C. J.* See *Mitchell's Estate*, 2 *Watts* 87 ; *Brackenridge's Misc.* 117. " Even yet she takes a preference with regard to the estates of living debtors, for an account settled by the accounting officers of the commonwealth becomes a lien on all the real estate of the debtor." *Ibid.* ; *Forney* v. *Com.*, 10 *Pa. St.* 405 ; see *Com. Appeal*, 4 *Pa. St.* 164 ; *Arnold's Estate*, 46 *Pa. St.* 277.

MASSACHUSETTS.—Under a statute providing that the warden of the state prison was not, in effect, an agent of the state, and that consequently moneys received and deposited by him in a bank were not state funds, nor held in trust for the state,—*Held*, therefore, that such money could not be set off against a demand of the bank upon the

passed to the Duke of York, by the charters granted to him by his brother, Charles II of England, in 1664 and 1674, as one of the royalties incident to the powers of government, and were held by him in the same manner, and for the same purposes, that the navigable waters of England, and the soils under them, are held by the crown. All the interests of the Duke of York in East New Jersey, including the royalties and powers of government, were conveyed to the proprietors of East New Jersey, as fully and amply, and in the same condition as they were granted to him, and they had the same dominion and property in the navigable waters and soil under them, and in the rights of *fishery*, that had belonged to him under the original charter, and were held by them as a *prerogative* right, and incident to the *regal* authority; and were, by the said proprietors, in 1702, surrendered to Anne, queen of England, and her heirs and successors. The surrender, according to its evident object and meaning, restored to the crown, in the same plight and condition, whatever the Duke of York held as a royal prerogative right, with the political power to which it was incident. When the people of New Jersey took possession of the reins of government, and took into their own hands the powers of sovereignty, the *prerogatives* and *jura regalia* which before belonged to either the crown or the par-

state. *Com.* v. *Phœnix Bank,* 11 *Metc.* 129. See, also, *Swartwout* v. *Mechanics Bank,* 5 *Denio* (*N. Y.*) 555; *Miller* v. *Receiver,* 1 *Paige* (*N. Y.*) 444. Following the Massachusetts case, the United States circuit court for *Wisconsin* (*E. D.*), decided, under a similar statute, that such warden was not to be considered a representative of the state of Wisconsin so far as to entitle him to claim, in distributing assets, a preference for the sum deposited by him in a bank which afterwards became insolvent. *Corn Exchange Bank Case,* 15 *Nat. Bank. Reg.* 431, *Drummond J.* [*N. B.* Under the Bankrupt Act the state is preferred.] See, also, *Brand's Case,* 3 *Nat. Bank. Reg.* 324.

NORTH CAROLINA.—After a fraudulent conveyance of lands and a sale under execution against the vendor, the fraudulent vendee, before the delivery of the sheriff's deed, entered into recognizance to the state.— *Held,* that as the fraudulent vendee had no valid title to the lands at the time of giving the recognizance, the state could thereby derive no preference over the execution purchaser, the sheriff's deed relating back to the time of his sale. *Hoke* v. *Henderson,* 3 *Dev.* 12.

liament, became immediately and rightfully vested in the state."

The early history of New Jersey and Maryland are almost identical in respect to these questions.    The grant to Lord Baltimore and the Duke of York were great state papers, framed with great deliberation; were submitted to the law officers of the crown, and every word well weighed and understood.    The cotemporaneous history of England abundantly manifests this.

"The preference in payment of debts was a branch of government prerogative at common law, and it was introduced as such in Maryland.    It is still the law where the property of the debtor remains in hand, and there is no lien standing in the way."    1 *Kent Com.* (12th ed.) 248, *note* (*b*).

The third article of the declaration of rights made on the 3d of November, 1776, declares that the inhabitants of Maryland are entitled to the common law of England and the trial by jury, according to the course of that law, and to the benefit of such of the English statutes as existed at the time of their first emigration, &c.

The constitution of New Jersey, approved in provincial congress, at Burlington, July 2d, 1776, declares "That the common law of England as well as so much of the statute law as has been heretofore practiced in this colony, shall

---

The preference of the state is confined to its own claims, and does not embrace those of corporations of which the state is owner in whole or in part (*Bank of South Carolina* v. *Gibbs*, 3 McCord (*S. C.*) 377; *Fields* v. *Wheatley*, 1 Sneed (*Tenn.*) 351.    See *Bank of Alabama* v. *Gibson*, 6 *Ala.* 814; *Turnpike Co.* v. *Wallace*, 8 *Watts* 316; *Moore* v. *Wabash Canal Co.*, 7 *Ind.* 462; *Seymour* v. *Milford Turnpike Co.*, 10 *Ohio* 476; *State Bank* v. *Brown*, 1 *Scam.* (*Ill.*) 106; *Governor* v. *Woodworth*, 63 *Ill.* 254); unless expressly included by statute.    *Central Bank* v. *Little*, 11 *Ga.* 346; *Robinson* v. *Bank of Darien*, 18 *Ga.* 65; *State* v. *Dickson*, 38 *Ga.* 171; *Mahone* v. *Central Bank*, 17 *Ga.* 111; *Tilford* v. *Bank of Ky.*, 2 *Dana* 115, 121.

KENTUCKY.—It is only over debtors of the same degree; hence, an individual debtor by specialty is preferred to the state by simple contract.    *Com.* v. *Logan*, 1 *Bibb* (*Ky.*) 529; *Smith* v. *State*, 5 *Gill* 45.

So an individual judgment debt is preferred to an unsecured claim of the state.    *Hollingsworth* v. *Patten*, 3 *Har. & McH.* (*Md.*) 125; *State* v. *Cleary*, 2 *Hill* (*S. C.*) 600; *Brackenridge's Misc.* 142.

still remain in force until they shall be altered by a future law of the legislature; such parts only excepted as are repugnant to the rights and privileges contained in this charter; and that the inestimable right of trial by jury shall remain confirmed as a part of the law of this colony, without repeal, forever." *P. L.* 1821, p. 7, § 22.

In the case of *State of Maryland* v. *Bank of Maryland*, it was held: " The royal prerogative right of preference in payment of debts is a branch of the common law of *England*, and that common law has been adopted in this state by the general terms of the declaration of rights and the third article thereof. And this secures to the state the right at common law to have its debts first paid out of the property of the debtor remaining in his hands, and no lien standing in the way. The right of priority of the state is a rule only in the distribution of the property of the debtor, requiring the debt due to the state to be first paid, where the individual creditor has no antecedent lien overreaching it. The state of Maryland's funds were deposited in a bank under resolutions of the general assembly, and the bank being in failing circumstances, the president and directors thereof transferred all its property to trustees for the equal benefit of all its creditors. Held, that the assignment was valid, and that the preference which the state had in the

MARYLAND.—It has been held that the lien of the state begins when suit is instituted. *Hodges* v. *Mullikin*, 1 *Bland* 503 ; *Jones* v. *Jones*, 1 *Bland* 443 ; *Davidson* v. *Clayland*, 1 *Har. & Johns.* 546.

GEORGIA.—That the state is not entitled to the writ of protection nor the extent in chief or in aid. *Robinson* v. *Bank of Darien*, 18 *Ga.* 65 ; but see *Jones* v. *Jones*, 1 *Bland* (*Md.*) 443 ; *Birchfield* v. *Brown*, *Id.* 446, *notes*.

The following cases are examples of the rule that proceedings in bankruptcy do not apply to or affect a state :

In *People* v. *Duncan*, 41 *Cal.* 509, a franchise to construct a turnpike was held to be not assignable to a bankrupt assignee, without the consent of the granting power. See *Stewart* v. *Hargrove*, 23 *Ala.* 429.

In *Stokes* v. *Georgia*, 46 *Ga.* 412, a sale of a bankrupt's land by his assignee was held not to divest the lien of the state thereon for taxes, although it was sold by the assignee free from encumbrance. See, also, *Doane* v. *Chittenden*, 25 *Ga.* 103 ; *Missouri* v. *Rowse*, 49 *Mo.* 586 ; *Brand's Case*, 3 *Nat. Bk. Reg.* 324 ; *Dunlap* v. *Gallatin Co.* 15 *Ill.* 7.

payment of her claim so long as the title to the property remained in the bank was defeated by the deed of trust."

The vice-chancellor says, " An author quite as eminent as a jurist as any name that ever adorned the American bench, has stated that the right of preference of a state, in this country, does not rest upon the common law, but exists only where given by statute," citing 1 *Kent Com.* 248, *note* (*c*).

By reference to the note on page 248 (12th ed.) (the note being there marked *note* (*b*)), it appears that it was the remark of a judge in South Carolina in the case of *State* v. *Harris*, 2 *Bailey* 598, and not the opinion of the eminent jurist alluded to; but, on the contrary, the case shows that it was the opinion of Judge O'Neall: That as the statutes of South Carolina had specified when priorities should exist they had excluded the common law rule; and the early history of South Carolina shows that, unlike Maryland and New Jersey, the common law was never adopted in that state. The authority, therefore, cited by the vice-chancellor, amounts to nothing, except to the point that South Carolina did not adopt the common law including the *lex prerogativa*.

The note in *Kent*, after citing the law in Maryland as laid down in the case of *State* v. *Bank of Maryland, alludes to the rule in South Carolina* and then concludes: " The common

---

In *Com.* v. *Hutchinson,* 10 *Pa. St.* 466, to an action brought by the state for taxes on fees received by the defendant, from his successor, after the defendant's removal from the office of prothonotary, the defendant pleaded his discharge in bankruptcy.—*Held,* that such discharge did not bind the state.

In *Saunders* v. *Com.* 10 *Gratt.* 494, a similar plea to an information by the attorney-general against an inspector of a public warehouse and his sureties, for the amount of dues owing to the state by the inspector, was overruled on the same ground.

In *People* v. *Spalding,* 10 *Paige* 284, a defendant in chancery had been committed for contempt for not paying a fine.—*Held,* that his discharge in bankruptcy would not release him from its payment or from the confinement. [This case was afterwards affirmed in the New York court for the correction of errors, 7 *Hill* 301, and, again, in the United States supreme court. 4 *How.* 21.]

In *Jones* v. *State,* 28 *Ark.* 119, it was held that a discharge in bankruptcy was a good plea by a surety on a recognizance on an indictment.

law prerogative of the king to be paid in preference to all other creditors, is therefore not *universally* adopted in this country," &c., &c.   See 1 *Kent Com.* 248, *note* (*b*).

In the year 1848, in the case of *Green's Estate*, 4 *Md. Ch.* 349, it was held : " Whenever the state and a citizen have claims in equal degree, and a conflict arises by death or the act of the party not having enough to pay his debts, the claim of the citizen must yield to the right of the state."

And in the year 1856 the court of appeals in the state of Maryland, in the case of *State* v. *Baltimore*, reported in 10 *Md.* 504, held : " Where the *state* and other *parties* are creditors under the *same bond* of the *same party* who has conveyed his property by a deed of trust to indemnify his sureties on the bond, the state, by virtue of its prerogative, is entitled to priority of payment out of the proceeds of the property sold by the trustee in the deed, under the direction of a court of equity."

Georgia was one of the states that introduced the common law by enactment.   The act can be found in *Marb. & Crawf. Dig. of Ga.* 404.   "And also the common law of England and such of the statute laws as were usually in force in the said province."   The words are almost identical with the words in the constitution of New Jersey and in the declaration of rights in Maryland.

Bankrupt acts do not include the king (*Anonymous*, 1 *Atk.* 262 ; *Rex* v. *Pixley*, *Bunb.* 202 ; *Russel's Case*, 19 *Ves.* 164, 165 ; *Temple's Case*, 2 *Ves. & Beam.* 391 ; *Cranford* v. *Att'y-Gen.* 7 *Price* 1) ; nor, the United States (*United States* v. *Rob Roy*, 1 *Woods* 42 ; *United States* v. *Herron*, 20 *Wall.* 251 ; *Lewis* v. *United States*, 2 *Otto* 618, 622).

The same rule applies to proceedings in insolvency.

In *People* v. *Rossiter*, 4 *Cow.* 143, a judgment was obtained by the state against an attorney for fees due the state, and under a *ca. sa.* issued thereon he was imprisoned,—*Held*, that a subsequent insolvent discharge would not release him.

In *People* v. *Herkimer*, 4 *Cow.* 345, to an action of *assumpsit* for fees due the state, the defendant pleaded that after the promises etc., he had obtained his discharge as an insolvent, and such plea, on general demurrer, was overruled.   See, also, *State* v. *Baltimore*, 10 *Md.* 504, *ubi supra ; Smith* v. *Randall*, 1 *Allen* 456, 460 ; *Att'y-Gen.* v. *Baker*, 9 *Rich.* (*S. C.*) *Eq.* 520.

The adjudication on the subject in Georgia is that the sovereign right of priority *existed at common law*, and became a part of the law of Georgia. That it was a wholesome right and its exercise was necessary to protect the public revenue. The claim was not made in that state until 1855, so that the case is a direct authority against the vice-chancellor's doctrine that the right could be lost by non-user.

Judge Lumpkin says : " The sovereign right of the state to priority of payment out of the effects of an insolvent, is based upon the common law, and was adopted by the act of 1784, which introduces into the jurisprudence of Georgia the whole body of the common law. * * * * It is a wholesome right, and as such should receive the sanction and approbation of the courts. This right of priority is not inconsistent with the principle or spirit of our institutions, but is necessary for the protection of the public revenue, so as to enable the government to accomplish the end of its institution." *Robinson* v. *Bank of Darien*, 18 *Ga.* 66.

St. George Tucker, in his *Commentaries on Blackstone*, says : " As it respects the commonwealth of Virginia, considered as an independent state, unconnected with any other," the tracing of the progress of the common law of England to our own shores, " might have been regarded as an unneces-

---

In *Columbian Ins. Co. Case*, 3 *Keyes* 123, after an assessment for taxes on the *personalty* of the company and a demand for payment, a receiver was, at the instance of a stockholder, appointed and qualified on the same day on which the marshal issued a warrant to collect the taxes.— *Held*, that the claim of the state took precedence over that of any creditor of the corporation.

In *State* v. *Walsh*, 2 *Gill & J.* (*Md.*) 406, the defendant obtained his insolvent discharge after the state had recovered judgment against him as surety on a delinquent tax-collector's bond. Subsequently he was arrested on a *ca. sa.* thereon.—*Held*, that he could plead his discharge in bar.

In *State* v. *Harris*, 2 *Bailey* 598, the state was held to be entitled to no preference over any other creditor, in the distribution of an insolvent's assets.

In *Scott's Case*, 19 *Ohio St.* 581, it was held that a statute authorizing parties imprisoned for the non-payment of fines to be discharged upon taking the benefit of the insolvent laws, was constitutional.

21

sary trouble at this day; the convention by which the constitution of the commonwealth was established having expressly declared 'that the common law of England and all statutes or acts of parliament made in aid of the common law prior to the fourth year of James the First, which are of a general nature, not local to that kingdom, together with the several acts of the colony then in force, so far as the same may consist with the several ordinances, declarations and resolutions of the general convention, shall be considered as in full force until the same shall be altered by the legislative powers of the commonwealth.' (*Ord. of Com.*, *May*, 1776, c. 5, *Chancellors* 37.) From all these considerations it will appear that in our inquiries how far the common law and statutes of England were adopted in the British colonies; or, in other words, what parts of those laws might be deemed applicable to their respective situations and circumstances, we must again abandon all hopes of satisfaction from any *general theory*, and resort to their *several charters*, *provincial establishments*, *legislative codes and civil histories* for information. For, although the colonial legislatures are understood to have been inhibited from passing any law derogatory from the sovereignty of the crown or repugnant to the laws and statutes of England, which seems to have been the only common rule imposed upon them, yet the

---

An insolvent discharge does not bar the United States ( *United States* v. *Wilson*, 8 *Wheat.* 253; *Glenn* v. *Humphreys*, 4 *Wash. C. C.* 424; *United States* v. *Hewes*, *Crabbe* 307).

In *Sessions* v. *Stevenson*, 11 *Rich.* (*S. C.*) *Eq.* 282, it was held that if the United States came in under a bill to marshal assets, it stood on the same footing as other creditors. See *Mitchell's Estate*, 2 *Watts* 87.

Assignments for the benefit of creditors do not affect a state.

In *Missouri* v. *Rowse*, 49 *Mo.* 586, a corporation, after neglecting for several years to pay their taxes, finally made an assignment. Afterwards the tax-collector seized their personal property, on which it was admitted he had no lien before (at common law, there is no lien on personalty for taxes, *Bailey* v. *Fuqua*, 24 *Miss.* 497), and it was bid in, at the sale, by the assignees, who then sued the collector on his official bond.—*Held*, that the claim of the state was not affected by the assignment. Compare *State* v. *Grover*, 8 *Vr.* 174; *Cones* v. *Wilson*, 14 *Ind.* 465; *Frierson* v. *Branch*, 30 *Ark.* 453. See *Anderson* v. *Mississippi*, 23 *Miss.* 459; *Murray* v. *Rottenham*, 6 *Johns. Ch.* 52.

Freeholders of Middlesex Co. *v.* State Bank at New Brunswick.

application of this rule in the several colonies will be found to have been as various as their respective soils, climates and productions."

The constitution of Massachusetts declares " that all the laws which had been theretofore adopted, used and approved in the province, colony or state of Massachusetts-Bay, and usually practiced on, in the courts of law, shall still remain and be in full force, until altered or repealed by the legislature."

The constitution of South Carolina, established March 19th, 1778, declares " that the resolutions of the late congresses of that state, and all laws then in force there and not thereby repealed shall so continue until altered or repealed by the legislature of the state, unless where they are temporary."

In commenting upon these clauses; neither of which adopt the common law of England, and contrasting the result with the effect of such clauses introduced by New Jersey and Maryland, Mr. Tucker says : " The adoption of the laws of England, we see, was confined to such as had been theretofore adopted, used and approved, *within* the colony, and usually practiced on in the courts of law, with an exception as to such parts as were repugnant ·to the rights and liberties contained in the constitution. It was therefore essential to the force and obligations of any rule of the common law that it had been before that time actually adopted, used or

---

In *State of Maryland* v. *Bank of Maryland,* 6 *Gill & Johns.* 205, funds of the state were deposited in a bank which afterwards made an assignment.—*Held,* that the priority of the state was thereby destroyed.

The following opinions, possessing some historical as well as legal interest in connection with this subject, are here inserted: The prerogative right to royal mines was formerly asserted in New Jersey, as appears by the opinions of Sir Robert Raymond, attorney-general, and Sir Philip Yorke, solicitor-general, upon the application of Gov. Burnet, December 12th, 1722 (*Forsyth's Opinions* 158).

"The right to fines, forfeitures and escheats in New Jersey, belongs to the king, and not to the proprietors of the soil, by virtue of the grant to the Duke of York."—Sir Edward Northey, attorney-general, A.D. 1705 (*Forsyth's Opinions* 157).—REP.

approved *in* the colony; and further, that it should not be repugnant to the rights and liberties contained in the constitution.    Although it might be found in every law treatise, from Bracton and Glanville to Coke, Hale, Hawkins and Blackstone, or in every reporter from the year-books to the days of Lord Mansfield, it would have no more force in Massachusetts than an edict of the emperor of China."

The vice-chancellor further says that Mr. Griffith declared it to be his opinion " that our laws give no preference to debts of any kind due to the state; they stand only on the same footing as other debts, according to their degree."    4 *Grif. Law Reg.* 1281, *note* (2).

By reference to the citation it appears that Mr. Griffith does not sustain the position which he is cited to support. Under the title, " *Payment of debts by executors and administrators*," he asks the question, " Is the law of England in regard to the order of paying debts by executors and administrators, in force ?" and answers it, viz. : " Where executors and administrators do not proceed as upon an *insolvent* estate, we have no law, so far as respects the *order and priority of payment of debts* and administration of the personal assets, other than the *common law ;* except that an *executor*, being a debtor, is not released from his debt by such appointment, unless so expressed in the will; but it is to be assets, and so accounted for."    (*R. L.* p. 573.)    By a note he says: " Our laws give no preference to debts of any kind due to the state; they stand only on the footing of other debts, according to their degree."    It appears, therefore, that in the text he says that we have " no law but the *common law ;*" in the note he informs us of the fact that the statute referring to the payment of debts by executors and administrators contains no reference to the priority of the state.    *The statutes referred to, and of which he is speaking, refer only to the estate of decedents.*

Yet, by reference to a portion of the vice-chancellor's opinion, already quoted, it will be seen that the king cannot

be divested by a general law of his rights, unless the statute is *made to extend to him by express words.*

The authority of Mr. Ewing is simply to the same effect. The deduction made from the passage by the vice-chancellor is *non sequitur;* he assumes that because a statute directory to executors and administrators, directing the order in which the debts of intestates shall be paid, does not include the priority of the sovereign, therefore the common law prerogative in cases of insolvent debtors is thereby abolished. See 2 *Kent Com.* *416; *Mitchell's Estate,* 2 *Watts* 87.

The vice-chancellor further says: " The federal government *unquestionably possessed* as high a prerogative right as a creditor as any sovereignty could under a government republican in form, yet it never attempted to exercise the crown's common law prerogative in this respect, but as early as 1797 established a right of preference by statute."

Now the simple truth is, that the federal government never possessed any common law power whatever, it being a fact, that has never been disputed, that it is a government of limited power, possessing no other rights than those conceded by the states. The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.

Mr. Tucker says : " It is distressing to reflect that it ever should have been made a question whether the constitution of the United States, on the whole face of which is seen so much labor to enumerate and define the several objects of federal power, could intend to introduce in the lump, in an indirect manner, and by a forced construction of a few phrases, the vast and multifarious jurisdiction involved in the common law; a law filling so many ample volumes; a law overspreading the entire field of legislation ; a law that would sap the foundation of the constitution, as a system of limited and specified powers."

It was necessary for the sovereign to have the right, and therefore, under the exercise of its duty to pay the public

dcbts, it was held, in *Fisher* v. *Blight*, that congress possessed the power to pass such a statute.    See 2 *Kent* 244. The fact that the federal government did not possess the power, so far from being an argument in favor of the states not inheriting it, is, on the contrary, additional evidence that the common law prerogative of the sovereign remained unimpaired in the states.

III. *If the prerogative existed, it could not be lost by non-user.*

The vice-chancellor says: " So far as my knowledge extends, no law officer of the state has ever attempted to enforce it.   For over one hundred years, as an actual practical prerogative of government, it has neither been exerted nor recognized, and this   *   *   would seem to negative the existence of the right with great emphasis."   No argument can be deduced from non-user or the failure to assert it on the part of the law officers of the state—(1) Because, having been adopted by the constitution of the state, and declared to be a part of the law of this state by the supreme courts of this state and of the United States, its existence does not depend upon its exercise.   (2) *Nullum tempus occurrit regi* has been the standing maxim upon all occasions.

In *Sanderson* v. *Baker & Vorste*, 4 *Mass.* 422, Chief Justice Parsons says : " No laches can be imputed against the government, and *against it no time runs so as to bar rights.*"

The right of proclaiming war or peace, making treaties and sending ambassadors, the *jus regium* in the shore, can not be lost by non-user.   This latter was never asserted in New Jersey until 1821, and Judge Baldwin, in 1830, expresses an opinion that this right ought to be considered as established by the decision of *Arnold* v. *Mundy*.   It is well known that the decision of the courts of this state since that time have advanced in the claim of the extent of this prerogative, until now, in derogation of common right, the riparian proprietor can be cut off from access to the water adjacent to his upland.   As late as 1842 the question was again before Chief Justice Taney.

The whole of the riparian laws, and the decisions of our courts thereupon, are gross assumptions of power if the suggestion of the vice-chancellor is tenable, for the right exercised by New Jersey to-day over the shore is at least as great as ever was claimed by the British crown.

Where can we turn to any claim made by any law officer to immunity on the part of the state from being sued, or protection for the property of the people from the process of the courts? It exists only by virtue of the sovereign prerogative, and because the state can do no wrong. The occasions for its assertion never occur.

In Maryland the sovereign claim of priority for its debts was not asserted until 1834, nearly sixty years after the declaration of independence; and yet the suggestion that this common law prerogative of the sovereign adopted by their bill of rights had been lost by non-user, was not even suggested in the Maryland case.

IV. *The title to the property of an insolvent corporation is not divested by force of law upon the appointment of a receiver.*

The vice-chancellor says, title to this property is divested by force of law, and such divestiture is perfect and absolute, and that no claim was made by the state until after a receiver had been appointed.

It appears in the case that, without making the state a party, or without any notice to the state treasurer or law officers of the state, the bank in New Brunswick which had on deposit $34,000 of the taxes of the people of Middlesex county, deposited there by the collector of the county to the credit of the treasurer of the state, was declared insolvent and a receiver appointed. Immediately thereupon, by the direction of the then attorney-general, Hon. Jacob Vanatta, the state treasurer demanded the amount in full as a preferred claim, to which demand the reply was "that they were not in a condition to pay at that time." On July 7th, 1877, the state treasurer filed a petition on behalf of the state, asking an injunction to prevent any payment being made until the right of the state could be determined, which

order was granted, and now the vice-chancellor holds that although the right of the state might have been perfect on the day the receiver was appointed, that that appointment divested the title to the property by force of law.

The vice-chancellor has here fallen into an error in reference to a fundamental principle, and as it is made a part of the syllabus of the case as reported, it is of paramount importance that it should be corrected by this court.

In *Kline* v. *Jewett*, 11 *C. E. Gr.* 474, the vice-chancellor himself held that the receiver of the Erie Railroad Company stood in respect to duty and liability just where the corporation would were it operating the road. " That whether the receiver is regarded as the officer of the law or the representative of the proprietors of the corporation or its creditors, or as combining all their characters, he is trusted with the powers of the corporation and must, therefore, necessarily be burdened with its duties and subject to its liabilities." .

The decree in the case is manifestly founded upon the undisputed doctrine that the receiver is an officer of the courts holding possession for those who may be decreed to have the right. *His possession was their possession.*

Mr. Kerr, in his book on Receivers, says : " The effect of the appointment of a receiver is to remove the possession of the property from the parties to the suit. If, at the time a receiver is appointed, a party claiming a right in the same subject-matter under a title paramount to that under which the receiver is appointed, is in possession of the right which he claims, the appointment of a receiver leaves him in possession, but parties to the suit, who are not in possession under a paramount title, are removed from possession by the appointment of a receiver. If a party to the suit be appointed receiver, the same rule obtains.

" The appointment of a receiver, however, does not in any way affect the right to the property. The court of chancery, in a suit for a receiver, deals with the possession only, until the right can be determined, if the right be the

subject-matter in dispute between the parties, or until the encumbrances have been cleared off, if the appointment has been made at the suit of an encumbrancer.    *Where the right is the subject-matter in dispute, the receiver merely holds the property for whosoever may ultimately appear to be entitled to it."* *Kerr on Receivers* 158, 159.

He refers to the case of *Evelyn* v. *Lewis,* 3 *Hare* 472, where the argument of Messrs. Cooper and Rolt, followed by the opinion of Vice-Chancellor Wigram, would seem to leave no room for doubt or dispute on this proposition.    A note in the American edition says : " That a receiver represents the interests of all the parties in the property, and that it is his duty to protect it to the best of his ability for all those interested, although those interests may be various and conflicting or involved in doubt."    See *Iddings* v. *Bruen,* 4 *Sandf. Ch.* 417 ; *Hutchinson* v. *Lord Massareene,* 2 *Ball & B.* 55 ; *Davis* v. *Duke of Marlborough,* 2 *Swans.* 125 ; *Delaney* v. *Mansfield,* 1 *Hog.* 234.

In the Maryland case, Chief Justice Buchanan says : " We have endeavored to show that this is a fair and *bona fide* assignment for a valuable consideration and passes the property from the bank and beyond its power or control. If so, and a similar assignment in England has the effect to protect the property against the king's *extent* and to defeat his priority (as we have seen it does), it has equally the effect here to protect the property in the hands of the trustees against common law priority of the state."

The vice-chancellor has, evidently, been led into error, by failing to observe the distinction drawn between a *valid assignment,* under a deed which has divested the insolvent of his property, by his own act, *and the possession of a receiver.*

In conclusion, it is insisted that the view taken by the vice-chancellor, that the assertion of this right of priority, on the part of the state, should be regarded as in antagonism to the cardinal objects of a government established by the people, for their common protection and security, is

founded on a misconception of the theory of the government. The prerogative in reference to his revenue was given to the king, at least in theory, not for his own good, but for the common good of his subjects. The *jus regium* in the shore and beds of navigable rivers he held for the benefit of his people. This section of the prerogative, Sir William Blackstone tells us, was one of the incidental prerogatives of the crown, having a relation to something else, *distinct from his person*—indeed, only an exception, in favor of the crown, to those general rules that are established for the rest of the community. "*Such as that no costs should be recovered against the king; that his debts should be preferred to any of his subjects.*"

The federal government of the United States, not having the power as a prerogative at common law, claimed it as an incident to the constitutional duty of collecting the public revenue and paying the public debt—the supreme court of the United States holding the act of congress constitutional on this ground alone. And the exercise of this right so acquired and denounced by the vice-chancellor as rigorous, has recently saved the federal government from heavy loss at the expense of all private creditors in the case of Jay Cooke, McCullough & Co.

South Carolina, upon the *dicta* of whose courts, repudiating the common law of England, the vice-chancellor based his opinion on this point, took care to provide, by special statute, for the priority of the sovereign's claim for taxes. The railroad tax law of our own state makes this lien for taxes paramount to mortgaged debts incurred prior to the assessment of the tax. Nearly every state in the Union which repudiated our common inheritance, was obliged, by necessity, to re-enact this sovereign prerogative by statute.

It is the duty of the attorney-general to insist that the taxes of the people of Middlesex county, deposited in the State Bank at New Brunswick, by the county collector, subject to the order of the state treasurer, were a sacred trust. It was the product of their labor, drawn from them by the

sovereign power, and it was under the protection of the common law which is their common heritage. If the tax be lost or stolen in its transmission to the treasury, the necessities of government require that it shall be replaced, and thus, for the benefit of a commercial institution or its creditors, established for purposes of private profit or engaged in speculation, the people will be obliged to submit to retaxation.

*Mr. A. V. Schenck*, for the receiver.

The State Bank at New Brunswick became insolvent March 31st, 1877, and a petition was filed by the board of chosen freeholders of the county of Middlesex, in the court of chancery, as creditors of the bank, for an injunction and the appointment of a receiver, under the act entitled "An act concerning corporations." (*Rev.* p. 175.) The chancellor granted the injunction, and appointed a receiver April 7th, 1877. George M. Wright, state treasurer, had at that time deposited in the bank, in his name, as treasurer, the sum of $33,990. He subsequently (July 7th, 1877) filed his petition in chancery, claiming the right to be paid in full in preference to all other creditors of the State Bank, under an alleged state prerogative.

The principle is thus stated by Coke (*Co. Lit.* 131 (*b*)): "The king, by his prerogative, regularly is to be preferred in payment of his duty or debt, by his debtor, before any subject, although the king's debt or duty be the latter, and the reason hereof is, for that *thesaurus regis est fundamentum belli, et firmamentum pacis.* And thereupon the law gave the king remedy, by writ of protection, to protect his debtor, that he should not be sued or attached until he paid the king's debt. But hereof grew some inconvenience, for, to delay other men of their suits, the king's debts were more slowly paid. And, for remedy thereof, it is enacted by the statute of 25 *Eliz.* 3, c. 19, that the other creditors may have their actions against the king's debtor, and proceed to

judgment, but not to execution, unless he will take upon him to pay the king's debt, and then he shall have execution against the king's debtor for both the two debts. This kind of protection hath (as it appeareth) no certain time limited in it.

But in some cases the subject shall be satisfied before the king; for, regularly, whenever the king is entitled to any fine or duty by the suit of the party, the party shall be first satisfied, as in a *decies tantum*. And so, if, in an action of debt, the defendant denie his deed, and it is found against him, he shall pay a fine to the king, the plaintiff shall be first satisfied; and so in all other like cases. And so it is in bills preferred by subjects in the star-chamber; their costs and damages (if any be) shall be answered before the king's fine, as it is daily in experience."

And the prerogative seems to be based in part upon the maxim, "*Quando jus domini regis et subditi insimul concurrunt, jus regis præferri debet.*" *Co. Lit.* 30 (*b*); 9 *Rep.* 129 (*b*); *Broom's Leg. Max.* 69, *marg. note; Whart. Leg. Max.* 155, *maxim* 70; 1 *Bla. Com.* 238, 239, 240; 2 *Bla. Com.* 408, 409; 3 *Bla. Com.* 420, 421. And it is contended, on the part of the appellant, that this prerogative of the king forms a part of the common law, and, as such, has been introduced into this country and into this state.

First—It is denied, on the part of the receiver, that this prerogative of the king has been introduced as a part of the common law, either into this country or into this state.

1. The prerogative flows from feudal principles, is based upon the theory of a monarchical and despotic government, and is utterly inconsistent with a republican form of government established for the good of the people. It is not a *direct*, but only an *incidental*, prerogative (2 *Bla. Com.* 240), and as such is only an exception, " in favor of the crown, to those general rules that are established for the rest of the community." And where it comes in conflict with the well-established right of the citizen, it must yield. "The king's prerogative stretcheth not to the doing of any wrong."    1

*Bla. Com.* 238; *Fin. L* 84, 85. It applies particularly to the king's *income* or *revenue*, and provision is otherwise fully made for the revenue of this state. And it was evidently the intention of the legislature to abolish all revenue based upon *prerogative*, such as *forfeitures* for crimes, *deodands* and the like, which are governed by the same principle as the prerogative in question.

2. The *adjudicated legal effects* of this prerogative show it to be inconsistent with a government formed for the welfare of the people. Beside the instances given by the vice-chancellor in his opinion (2 *Stew.* 268), the attention of the court is called to the following:

(*a*). The king's judgment affects all land which the king's debtor had *at or after the time of contracting his debt,* whereas between subject and subject the general rule is that a judgment has relation only to the day when signed. 2 *Tidd P.* 1058.

(*b*). If the king's debtor is unable to satisfy the king's debt out of his own chattels, the king can betake himself *to any third person who is indebted to the king's debtor*, and can recover of such third person what he owes to the king's debtor, in order to get payment of the debt due from the latter to the crown. 2 *Tidd P.* 1056. And so the king can betake himself to the debtor of the debtor of the king's debtor, and so on *ad infinitum*. 2 *Tidd. P.* 1058.

(*c*). The king's debtor *is prevented from making any will* of his personal effects without the sanction of the crown. *Broom* and *Whart., ubi supra.*

(*d*). Upon a debt of record, or a specialty, the writ of extent issues at the instance of the king, *without any previous suit* or proceeding, except an affidavit that the debtor is insolvent and the debt is in danger of being lost. And a simple contract debt may be raised to a debt of record by simply issuing a commission to ascertain the amount due, *without notice to the debtor.* By virtue of the writ of extent the sheriff may break into the debtor's house, if admission be refused, either to *arrest him* or to seize his goods. His

lands may be also taken and sold. A debtor taken under this writ cannot be bailed, *nor will his discharge under bankrupt or insolvent laws release him.* 2 *Tidd P.* 1044, 1046, 1049; 3 *Bla. Com.* 420, 421. How can the last-named legal effect of this prerogative be reconciled with the provisions of the constitution of this state (Art. I, § 17), which declares that " no person shall be imprisoned for debt in any action, or on any judgment founded upon contract, *unless in cases of fraud?"* Or with the bankrupt laws of the United States? Or with the insolvent laws of this state? (*Rev.* p. 497, §§ 1, 2.)

Second—This prerogative has not been adopted as a part of the common law *by the United States.* *Rev. St. U. S.* 691, § 3466, *tit.* XXXVI, " Debts due by or to the United States," which enacts: " Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor in the hands of the executors or administrators is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied, &c." *United States Bankr. Act,* § 28; *Bump's Bankr.* (6th ed.) p. 482; 1 *Kent Com.* 242, *Lect. XII; United States* v. *Fisher,* 2 *Cranch* 358; *United States* v. *Hooe,* 3 *Cranch* 73; *Prince* v. *Bartlett,* 8 *Cranch* 431.

Third—This prerogative has not been adopted as a part of the common law *by any state* of the United States. When adopted it is by *local statute.* 1 *Kent Com.* (10th ed.) 248, *note* (*c*); *Commissioners &c.* v. *Greenwood,* 1 *Desauss.* 450, *and Appendix* 599; *State* v. *Harris,* 2 *Bailey* 598; *Keckley* v. *Keckley,* 2 *Hill* (*S. C.*) *Ch.* 250–6; *State Bank* v. *Gibbs,* 3 *McCord* 377. And this was the fact in the state of Maryland, notwithstanding the language of the court in the case of *Maryland* v. *Bank of Maryland,* 6 *Gill & J.* 205, as appears by the case of *Davidson* v. *Clayland,* 1 *Har. & J.* 546, and the cases there referred to. The statute was passed in Maryland in 1778.

Fourth—This prerogative has not been adopted as a part of the common law *in this state.*

1. If this prerogative has any existence in this state, it exists in its strict common law form, not modified by statute, for all English statutes are declared no longer of force in this state. *Pat.* p. 436, § 4. And therefore any citizen indebted to the state is entitled to the state's writ of protection, as above.

2. There is no record, or other evidence, that this prerogative has been claimed by or allowed to the state of New Jersey since the establishment of the government thereof.

3. " Upon the revolution, all royal rights vested in the people of New Jersey, as the sovereign of the country, and are now in their hands; and they, having themselves both the legal estate and the usufruct, may make such disposition of them, and such regulation concerning them, as they may think fit; and this power of disposition and regulation can be exercised only by the legislative body, who are the representatives of the people for this purpose." *Arnold* v. *Mundy,* 1 *Hal.* 13, 78.

4. The whole course of legislation in this state is a renunciation of this prerogative, repudiates the doctrine, and is entirely inconsistent with its existence. This manifestly appears by reference to the following statutes :

(*a*). " An act respecting suits for the recovery of moneys due to the state," passed February 28th, 1820 (*Nix. Dig.* (4th ed.) 1000, §§ 19, 20), makes it the duty of the treasurer and secretary of state, in cases appertaining to their respective offices, *to commence suits,* in the name of the state of New Jersey, in the supreme court, for the recovery of all sums of money now due or which may hereafter become due to this state, *and the same to prosecute to final judgment and execution.* This statute repudiates the summary procedure by *writ of extent,* without suit or judgment. It directs proceedings *by suit* to be instituted in all cases where money is due to the state, and judgment and execution as in ordinary cases. The provisions of the constitution of this state (Art. I, § 17) apply in full force to all proceedings under this statute. Hence, *the arrest* of the state's debtor,

*in all cases*, and without regard to " cases of fraud," is clearly repugnant to the constitution.

(*b*). "An act providing for the collection of fines and costs," approved March 18th, 1851.    *P. L.* 348; (*Nix. Dig.* (4th ed.) 226, § 41.)    " Whenever judgment shall be rendered upon any indictment in the supreme court, or any of the courts of oyer and terminer and general jail delivery, or courts of quarter sessions of the peace of this state, *such proceedings may be had thereupon* for the purpose of obtaining satisfaction of the fine and costs, or costs adjudged, by writ or writs of *fieri facias, in the like manner and to the same effect as in civil cases.*"    Here is a debt adjudged to be due *to the state*, and yet the remedy for the collection thereof is by a writ of *fieri facias, in the like manner and to the same effect as in civil cases.*    The king's right to the " writ of extent," with its legal effects, is repudiated by this statute.

(*c*). "An act concerning the estate of persons who die insolvent," approved April 16th, 1846.    *Nix. Dig.* (4th ed.) 421, § 10; *Pat.* 435; *R. L.* 766; *Elmer's Dig.* 169; *R. S.* 346; *Rev.* p. 770, § 81; 4 *Grif. Law Reg.* 1281, *note* (2).    This statute declares certain preferences, yet does not give any to the state.    It directs distribution, without any preference to the state.

(*d*). "An act to secure to creditors an equal and just division of the estates of debtors who convey to assignees for the benefit of creditors," approved April 16th, 1846.    *R. S.* 316; *Nix. Dig.* (4th ed.) 32, § 1; *Rev.* p. 36, § 1.    Here is an act of the legislative department, approved by the executive (see 11 *Rep.* 70), which sanctions the assignment by the debtor, and expressly declares, in the most positive terms, that *there shall not be any preference by one creditor over another*, and that *any* such preference shall be *fraudulent and void.*.    Language cannot be more explicit than this.    How, then, can it be held that this prerogative exists in this state ?

*Prerogative* consists in the discretionary *power of acting for the public good* where *the positive laws are silent.*    1 *Bla. Com.* 252.

(e). "An act for the relief of persons imprisoned on civil process." (*Rev.* p. 497.)   That part of the act on page 503, § 20, relating to distribution of the effects of the insolvent.

(*f*). "An act to prevent frauds by incorporated companies," approved April 15th, 1846.   *R. S.* 129; *Nix. Dig.* (4th ed.) 408, § 15; *Rev.* p. 191, § 80.   See, also, *P. L.* 1877, p. 74. This act directs the distribution of the fund without recognizing any preference on the part of the state.

5. The leading decisions of the court of chancery in the construction of the "Act to prevent frauds by incorporated companies," preclude any such doctrine as preference on the part of the state.   *Coryell* v. *New Hope Del. Bridge Co.*, 1 *Stock.* 457; *Van Wagenen* v. *Paterson Savings Bank*, 2 *Stock.* 13; *Wells* v. *Rahway White Rubber Co.*, 4 *C. E. Gr.* 402.

6. The state is bound by these statutes by *necessary implication*, and no other conclusion can be deduced from them than that the legislative and executive departments of the state (11 *Rep.* 70) intended to abrogate the alleged prerogative.   1 *Kent Com.*, (10th ed.) 460; *Van Kleck* v· *O'Hanlon*, 1 *Zab.* 588; 1 *Bla. Com.* 262.   "The act which provides a necessary and profitable remedy for the preservation of right and to suppress wrong, shall bind the king." *Magdalen College case*, 11 *Rep.* 72.

7. The proceeds of the estate of the *testator*, as well as of the *intestate*, are, by the act relating to insolvent estates, ordered to be equally distributed among creditors as therein directed; thus repudiating the doctrine that the state's debtor cannot make a will of his personal effects without the sanction of the state.   *Supra*, p. 336.

8. *Morrow* v. *Dows*, 1 *Stew.* 459.   In this case, it is held by the court that there is not any priority on the part of the state, even in case of taxation, unless by lien created by express legislation.

Fifth—Conceding, for the sake of argument, that this prerogative does exist in this state, yet it does not apply to this case.

22

1. If not by the *express language* of the "Act to prevent frauds by incorporated companies," (*Rev.* p. 189, § 72, p. 191, § 77), certainly by *necessary implication*, the property of the insolvent corporation, on the appointment of a receiver, is vested, by operation of law, in the receiver, for the purposes of the act, and for the benefit of the corporation.

2. In this view only can the decisions in this state, on this subject, be reconciled with principle. *Willink* v. *Morris Canal and Banking Co.*, 2 *Gr. Ch.* 400; *Corrigan* v. *Trenton Del. Falls Co.*, 3 *Hal. Ch.* 489. Rents accruing after appointment belong to receiver. *Suydam* v. *Receivers &c.*, 2 *Gr. Ch.* 114. Receiver may ratify a sale made by the company after insolvency. *Knott* v. *Receivers &c.*, 4 *C. E. Gr.* 423. Receivers are not like executive officers, bound to sell for the highest price. *Klein* v. *Jewett*, 11 *C. E. Gr.* 474. To test the liability of the receiver the same rules must be applied as if the corporation were the actual party defendant before the court. And see, also, *P. L.* 1852, p. 397; *Rev.* p. 192, § 88.

3. This transfer of property to the receiver, for the purposes declared in the act, under the legislative and executive sanction of the state, must be deemed a *waiver* of any pretended preference on the part of the state.

4. The state, in and by this act, places itself on the same footing as other creditors of the corporation.

5. The transfer of property to the receiver, for the purposes of the act, is as effectual as if made by *deed of assignment*; in which case the prerogative would be lost. *Maryland* v. *Bank of Maryland*, 6 *Gill & J.* 205; *Thelusson* v. *Smith*, 2 *Wheat.* 396; *Wilcox* v. *Waln*, 10 *Serg. & R.* 380; *United States* v. *Mechanics Bank*, *Gilp.* 51.

Sixth.—This is not the action of the state in its sovereign capacity to enforce its prerogative, but a petition filed by George M. Wright, esq., state treasurer. In this case there has not been any suit brought in the name of the state, under the act of February 28th, 1820 (*supra*); no judgment recovered; no writ of extent or execution issued. There

Cubberly *v.* Glading.

has been nothing done *in the name of the state* to manifest the intention of the state to enforce its priority or prerogative, and to attach the lien thereof upon the fund or property. Now, the only *concurrence* of right as to the state and a citizen, under the eightieth section of the act (*Rev.* p. 191) is in case where the state has a judgment (or mortgage) and a citizen has a judgment (or mortgage).

In all other cases, by the express direction of the act, the fund is to be *proportionally* distributed. It is in contemplation of the legislature that the state shall *sue* and recover a *judgment* for any debt due it, the same as a citizen. Hence it follows that the state, not having recovered any judgment, is not entitled to be placed even among the preferred creditors recognized by the act.

Seventh.—In view of the statutes: *Nix. Dig.* 998, §§ 1, 3, —999, § 11, it becomes a grave question, whether, in the application of the rigid rules of an alleged state prerogative, George M. Wright is not *the state's debtor* to the amount of the deposit in question, instead of the insolvent corporation.

PER CURIAM.

This decree unanimously affirmed, for the reasons given by the vice-chancellor in the case below.

DELERHE P. CUBBERLY and others, appellants.

*v.*

WILLIAM GLADING, respondent.

*Mr. B. D. Shreve,* for appellants.

*Mr. F. Voorhees,* for respondent.