191 N.J. Super. 273 (1983)
466 A.2d 581
SHELDON KESSLER, PLAINTIFF,
v.
DANIEL TARRATS ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division Passaic County.
Decided April 18, 1983.
*280 Richard J. Savino for plaintiff (Grabow & Verp, attorneys).
Howard B. Epstein, Deputy Attorney General, for defendant and counterclaimant State of New Jersey, Department of Environmental Protection (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
Ralph L. DeLuccia, Jr. for defendant and crossclaimant City of Paterson (Ralph L. DeLuccia, Jr., Corporation Counsel, attorney).
*281 DWYER, J.S.C.
Plaintiff Sheldon Kessler (Kessler) assignee of a purchase money mortgage given to 190  16th Avenue Corporation on December 21, 1976, instituted this action to foreclose the mortgage on May 25, 1982.
By motion for summary judgment the Administrator of the New Jersey Spill Compensation Fund, N.J.S.A. 58:10-23.11j and q (Administrator) and N.J.S.A. 58:10-23.11i (Fund), seeks a judgment that the lien filed on July 27, 1982 and obtained under N.J.S.A. 58:10-23.11f(f) for the cost of clearing the subject premises of toxic waste is a first paramount lien over the lien of the City of Paterson (Paterson) for real estate taxes under N.J.S.A. 54:5-9, the lien of Kessler's mortgage and all other liens listed in footnote 1. Paterson moves for judgment that its lien is paramount to that of the Administrator in respect to the taxes reflected in a tax sale certificate recorded on February 4, 1981 as well as subsequent taxes. Kessler concedes that the lien of Paterson for taxes is paramount to the lien of his mortgage, but asserts that the priority of the lien of the Administrator as to his mortgage is invalid on the grounds that as applied to that mortgage N.J.S.A. 58:10-23.11f(f) is unconstitutional in that:
1. Said statute impairs the contract rights arising from the mortgage recorded before the relevant statute was enacted, contrary to U.S. Const., Art. I, § 10 and N.J. Const. (1947), Art. I, par. 1;
2. Said statute denies him of due process of law because no notice to the prior lien interests is required and unnecessarily inflicts an "oppressive and harsh consequence" to the holder of the mortgage, contrary to the requirements of U.S. Const., Amend. XIV and N.J. Const. (1947), Art. I, par. 1;
3. Said statute will effectively take Kessler's property without just compensation, contrary to U.S. Const., Amend. V and N.J. Const. (1947), Art. I, par. 20.
Based on examination of the documents in the title history and a supplemental affidavit of Kessler after the briefs were filed, Administrator urged in a reply brief that Kessler should be barred from attacking the constitutionality of the statute since he took his assignment of the mortgage after the statute was in effect, after the clean-up operation by the Department of Environmental Protection authorized by N.J.S.A. 58:10-23.11f *282 (D.E.P.) was under way, and for the purpose of discharging the debt obligations of himself and his wife as the only partners in Carshel Realty (Carshel), a partnership, which was the original mortgagor. Kessler responded that there was no extinguishment of the mortgage because he did not own the fee of the real estate when he took the assignment. Further, he had a claim against Foam Craft, Inc. which was the grantee of Carshel and accepted a deed which recited that Foam Craft, Inc. took subject to and assumed the payment of said mortgage. At oral argument counsel for Kessler represented that Foam Craft, Inc. is a viable corporation.[1] By deed dated December 1, 1979 and making no reference to the mortgage, Foam Craft, Inc. conveyed to Daniel Tarrats.
The first question is whether Kessler has a contract right which is subject to protection afforded by the relevant constitutional provisions. The deed from Carshel to Foam Craft, Inc., dated April 22, 1977, in relevant part provided:
Subject to an existing mortgage of record from the grantor to 190  16th Avenue Corporation dated December 21, 1976 recorded December 21, 1976 in Book U-72, page 109 which mortgage is being assumed by the grantee herein.
N.J.S.A. 46:9-7.1 states:

*283 Whenever real estate situate in this State shall be sold and conveyed subject to any existing mortgage or is at the time of any such sale or conveyance subject to an existing mortgage, the purchaser shall not be deemed to have assumed the debt secured by such existing mortgage and the payment thereof by reason of the amount of any such mortgage being deducted from the purchase price or by being taken into consideration in adjusting the purchase price, nor for any other reason, unless the purchaser shall have assumed such mortgage debt and the payment thereof by an express agreement in writing signed by the purchaser or by the purchaser's acceptance of a deed containing a covenant to the effect that the grantee assumes such mortgage debt and the payment thereof.
Prior to the enactment of the aforesaid statute, the courts had held that the mortgagor-grantor could sue at law the grantee who accepted a deed reciting that the conveyance was subject to an outstanding mortgage which the grantee assumed for the unpaid amount of the mortgage in event of default. The reason stated was that the action was one for breach of contract. Sparkman v. Gove, 44 N.J.L. 252 (Sup.Ct. 1882) (grantor-assignee from mortgagee entitled to recover unpaid balance of mortgage of $3,000 even though grantor paid $450 for the assignment. The measure of damages was breach of contract). In Herbert v. Corby, 124 N.J.L. 249 (Sup.Ct. 1940), aff'd o.b., 125 N.J.L. 502 (E. & A. 1940), plaintiff mortgagee was held to have an enforceable contract claim, as a third-party beneficiary, for the amount of a deficiency after foreclosure against the grantee who accepted the deed reciting that there was an existing mortgage and that grantee assumed to pay it. The then Supreme Court said:
... Certainly a grantee who assumes a mortgage debt and promises to pay it makes a contract with the grantor for the benefit of the mortgagee. We cannot, at the moment, imagine a contract, made more for the benefit of a third party. [124 N.J.L. at 254]
The purpose of N.J.S.A. 46:9-7.1, which was enacted in 1947, was to abolish in New Jersey the authority of the cases applying the concept of "implied assumption" where the consideration paid for the deed was the market value of the subject premises less the amount of the outstanding mortgage and there was no express assumption of the mortgage by the grantee. Many of those cases were based on equitable principles. See 29 N.J. Practice (Cunningham & Tischler, Mortgages) § 132 (1975). The aforementioned statute did not create the basis for the *284 contract rights here considered. It established that they must be in writing to be enforced. Said statute does, however, bar a claim by Kessler or others against Tarrats for the amount of the mortgage.
The courts have recognized the logic of the argument that where a debtor pays the creditor the debt is extinguished, for no person can at the same time be both debtor and creditor of the same debt. See 29 N.J. Practice, op. cit., § 153 at 708 (1975). But if a mortgagor has conveyed the premises to a grantee who takes under a deed reciting that it is subject to the mortgage and the grantee assumes to pay, and if thereafter the mortgagor takes an assignment of the mortgage, there is no merger. In such a situation the original mortgagor is a surety to the original mortgagee and the grantee has become the principal debtor. By taking an assignment of the debt and mortgage, the original mortgagor preserves the right of payment against the grantee  principal debtor and the lien of the mortgage is security for the payment of the debt.
In Stillman's Ex'rs v. Stillman, 21 N.J. Eq. 126 (Ch. 1870), a suit by the executors of the original mortgagor who acquired the mortgage by assignment to foreclose against a subsequent grantee who took subject to the mortgage and assumed to pay it, the court said:
The transfer of the mortgage to the executors of the mortgagor does not satisfy it. The land was owned by a third person, and the mortgage was a valid encumbrance upon it. One may purchase his own mortgage on land that he has sold, and although such purchase may render the bond unavailing, yet where lands are conveyed as these were, subject to the mortgage as part of the consideration, the mortgage is the principal security, and even if the obligor pays the bond, he is entitled to be subrogated as to the mortgage, and to be repaid out of the land what he has paid on his own bond. [at 129]
In this action neither Kessler nor Carshel owned the fee subject to the mortgage when, or since, Kessler acquired the mortgage; hence, the doctrine that when the owner of the equity of redemption acquires the mortgage there is a merger of interest does not apply. See 55 Am.Jur.2d, Mortgages, §§ 1387, 1398 (1971).
*285 From the record herein this court finds that the debt for which the mortgage is security is evidenced by a note and not a bond. The Supreme Court has heretofore commented about the different rights of the holder of a note and bond. See 79-83 Thirteenth Avenue, Ltd. v. DeMarco, 44 N.J. 525 (1965), and Schwartz v. Bender Invest., Inc., 58 N.J. 444 (1971).
In DeMarco, supra, Justice Hall, writing for the majority, said:
... In the case of default on a bond and mortgage, the mortgage must be foreclosed first in the Chancery Division. Suit may then be brought on the deficiency in the Law Division. The judgment there recoverable will, since N.J.S. 2A:50-3, be limited to the difference between the fair market value of the property and the debt regardless of the price received for the property at the foreclosure sale, the absence of objection to the sale or the equities of the situation. If the debt is evidenced by a note, the mortgagee has a choice. He may foreclose first if, for example, there are subordinate interests he wishes to cut off, and then sue for the deficiency, the amount of which will be determined solely by the difference between the foreclosure sale price and the debt. Or he may simply sue at law for the full amount due on the note, levy on the mortgaged property in execution of the judgment, and then seek satisfaction out of the defendant's other assets for the difference between the amount realized at the execution sale and the judgment. Under either procedure in the case of a note, he may seemingly himself acquire the property at the judicial sale for a nominal figure (if there are no other bidders), and still collect the full deficiency out of his debtor's other property during the next 20 years. [44 N.J. at 532-533 (citations omitted)][2]
*286 The mortgage assigned to Kessler on April 13, 1983, when executed and delivered on December 21, 1976, created a lien interest in the subject property to secure the payment of the note. See 29 N.J. Practice, op. cit., §§ 1, 4 (1975); Sears Roebuck & Co. v. Camp, 124 N.J. Eq. 403 (E. & A. 1938).
The court concludes that on April 22, 1977, the date the deed to Foam Craft, Inc. was delivered, Carshel acquired a contract right against Foam Craft, Inc. to have the partnership's debt on the mortgage paid. When the mortgage was not paid in accordance with its terms, Carshel had a right to enforce that contract in a personal action against Foam Craft, Inc. See Sparkman v. Gove, supra, in which the court said:
The covenant in the present case was one to pay the mortgage. Its language, "which mortgages are assumed by the party of the second part," imports that the grantee entered into a personal obligation, and took upon himself the duties of the covenantees with regard to the mortgage. Those duties comprised, in this instance, an obligation to pay the mortgage debt at its maturity, and this obligation must therefore be considered as assumed by the defendant. His covenant is not fairly capable of any less onerous interpretation. Braman v. Dowse, 12 Cush. 227.
On the breach of such a covenant, the damages recoverable are a sum sufficient to put the plaintiff in the position in which he would have stood if the covenant had been kept, i.e., one of complete exoneration from the obligation which the defendant had agreed to discharge. Such sum is the whole amount of the plaintiff's debt. The authorities to this effect are clear and weighty. They distinguish between cases growing out of the mere liability of the plaintiff as surety for the defendant, or mere contracts to indemnify, on the one side, and cases resting upon the express agreement of the defendant with the plaintiff to pay a debt for which the plaintiff or his property is bound. In the former class, payment by the surety or actual loss must precede recovery; in the latter, the promisee, on breach, may recover the amount of the debt. [44 N.J.L. at 254; citations omitted]
So far as this record discloses, Carshel still has that right; since Kessler and his wife were the only partners therein, presumably they still control it. That contract was not secured by a mortgage on the subject premises.
*287 When Kessler paid the note and took an assignment of the mortgage on April 13, 1982 from 190  16th Avenue Corp., he acquired a right of subrogation against Foam Craft, Inc. and conceptually acquired 190  16th Avenue Corp.'s right as a third-party beneficiary against Foam Craft, Inc. as well as the rights in the mortgage. Kessler's actions on April 13, 1982 were voluntary and gave rise to new rights, for he paid the debt of Carshel and not his own.
Administrator seeks to enforce the lien under N.J.S.A. 58:10-23.11f(f), which provides:
Any expenditures made by the administrator pursuant to this act shall constitute a first lien priority claim and lien paramount to all other claims and liens upon the revenues and all real estate of the discharger, whether or not the discharger is insolvent.
That provision was added by L. 1979, c. 346, § 4. The law was approved by the Governor on January 23, 1980 and by its terms took effect immediately. According to the legislative history furnished by the State Library, it was introduced in the Assembly on July 16, 1979. It was the subject of a public hearing on October 10, 1979 in Trenton, which is reflected in a report (Report).
As noted above, Tarrats accepted title in December 1979 and the evidence in the case referred to in footnote 1 shows that the acts pertaining to discharge occurred after the effective date N.J.S.A. 58:10-23.11 et seq.
When Kessler paid the debt of Carshel on April 13, 1982, N.J.S.A. 58:10-23.11 et seq. was in effect and hence said statute had no retroactive impact on that transaction. As stated above, Carshel could have obtained that money from Foam Craft, Inc. in a personal action.
On that date, the statute in question had been part of the law for over two years. Kessler is charged with knowledge of the enacted laws of the State. See Gibraltar Factors Corp. v. Slapo, 41 N.J. Super. 381 (App.Div. 1956), aff'd 23 N.J. 459 (1957), app. dism. 355 U.S. 13, 78 S.Ct. 44, 2 L.Ed.2d 20 (1957) (statute giving *288 mill owners a lien for up to six months unpaid rent, which lien was to have "priority and be paramount to any title, lien, interest, mortgage, judgment, or other encumbrance on machinery or other chattels" after they were placed in the rented space was held constitutional against constitutional attack on due process grounds). The Appellate Division said:
... it is elementary that all persons are conclusively presumed to know the law of the land, and ignorance thereof excuses no one. The law is a silent factor in every contract and the parties are presumed to have contracted with reference to it. [41 N.J. Super. at 384; citation omitted]
Kessler acquired the rights which he seeks to assert in this action to foreclose the mortgage after the effective date of the statute in question; hence, such rights were not impaired by any law subsequently enacted that affected those rights. Carshel's contract right is not impaired because it was not secured by the mortgage.
Alternatively, this court concludes that the statute in question is valid as a proper exercise by the Legislature of the police power and hence is not invalid because of any impact which it may have on the lien of the mortgage if the assignment to Kessler is analyzed as a transfer of a perfected and vested interest before the enactment of L. 1979, c. 346. This is relevant also as to the judgment referred to in footnote one.
In N.J.S.A. 58:10-23.11a the Legislature set forth its findings and declaration. In relevant part it said:
The Legislature finds and declares that the discharge of petroleum products and other hazardous substances within or outside the jurisdiction of this State constitutes a threat to the economy and environment of this State. The Legislature intends by the passage of this act to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharge.
In Provident Inst. for Savings v. Jersey City, 113 U.S. 506, 5 S.Ct. 612, 28 L.Ed. 1102 (1885), the Supreme Court held that a statute giving Jersey City a first priority lien for water charges over a mortgage recorded before any water was delivered to the *289 subject premises did not violate the Due Process Clause of the Fourteenth Amendment to the Constitution. The statute creating the priority had been enacted several years before the mortgage was given; hence, questions relating to Art. I, § 10 of the Constitution were not presented. The Supreme Court said:
In what we have now said in relation to the anterior existence of the law of 1852 as a ground on which this case may be resolved, we do not mean to be understood as holding that the law would not also be valid as against mortgages created prior to its passage. Even if the water rents in question cannot be regarded as taxes, nor as special assessments for benefits arising from a public improvement, it is still by no means clear that the giving to them a priority of lien over all other incumbrances upon the property served with the water would be repugnant to the Constitution of the United States. The law which gives to the last maritime liens priority over earlier liens in point of time, is based on principles of acknowledged justice. That which is given for the preservation or betterment of the common pledge is in natural equity fairly entitled to the first rank in the tableau of claims. Mechanics' lien laws stand on the same basis of natural justice. We are not prepared to say that a legislative Act giving preference to such liens even over those already created by mortgage, judgment or attachment, would be repugnant to the Constitution of the United States. Nor are we prepared to say that an Act giving preference to municipal water rents over such liens would be obnoxious to that charge. The providing of a sufficient water supply for the inhabitants of a great and growing city, is one of the highest functions of municipal government, and tends greatly to enhance the value of all real estate in its limits; and the charges for the use of the water may well be entitled to take high rank among outstanding claims against the property so benefited. It may be difficult to show any substantial distinction in this regard between such a charge and that of a tax strictly so called. But as the present case does not call for an opinion on this point, it is properly reserved for consideration when it necessarily arises. [Id. at 515-516, 5 S.Ct. at 615-616, 28 L.Ed. at 1106]
The Supreme Court has held that a legislature may enact a law to protect the public health or to abate a nuisance even if it has the effect of impairing a prior contract right. See Northwestern Fertilization Co. v. Hyde Park, 97 U.S. 659, 667, 24 L.Ed. 1036, 1039 (1878) (held, Hyde Park could enforce ordinance prohibiting the transportation of offal through it and prohibiting anyone from maintaining or operating, an offensive or unwholesome business within its boundaries. The law authorizing such ordinance was enacted after the legislature granted plaintiff a corporate charter to pick up offal at depots in Chicago and to have a plant to convert it to fertilizer in Cook *290 County south of a designated line where Hyde Park was located. The plaintiff corporation had a charter good for 50 years. It built its plant at a substantial cost and established its business in Hyde Park. The Supreme Court held that Illinois, under its police power, had authority to authorize abatement of nuisances and modify corporate grant.) There, the Supreme Court said:
That a nuisance of a flagrant character existed, as found by the court below, is not controverted. We cannot doubt that the police power of the State was applicable and adequate to give an effectual remedy. That power belonged to the States when the Federal Constitution was adopted. They did not surrender it, and they all have it now. It extends to the entire property and business within their local jurisdiction. Both are subject to it in all proper cases. It rests upon the fundamental principle that everyone shall so use his own as not to wrong and injure another. To regulate and abate nuisances is one of its ordinary functions. The adjudged cases showing its exercise where corporate franchises were involved are numerous.
........
Perhaps the most striking application of the police power is in the destruction of buildings to prevent the spread of a conflagration. This right existed by the common law, and the owner was entitled to no compensation. 2 Kent, Com., 339 (marg. paging), and notes 1 and a and b. [97 U.S. at 667, 669-70, 24 L.Ed. at 1039-1040]
In Erie R. Co. v. Board of Public Utility Comm., 254 U.S. 394, 41 S.Ct. 169, 65 L.Ed. 322 (1920), the Supreme Court affirmed a New Jersey decision directing the railroad to elevate its tracks and cross 15 streets in the City of Paterson by concrete and steel bridges at a cost of several million dollars. The decision below is reported at 89 N.J.L. 57 (Sup.Ct. 1916), aff'd 90 N.J.L. 672 (E. & A. 1917). The pertinent statute, which was enacted after the incorporation of the lessor railroads and the execution of leases by the Erie, authorized the Board of Public Utility Commissioners to order the elimination of dangerous conditions at grade crossings at the expense of railroads. It was held valid against attack under the contract clause and the due process of law clause. In so doing, Justice Holmes stated:
Grade crossings call for a necessary adjustment of two conflicting interests public using the streets and that of the railroads and the public using them. Generically the streets represent the more important interest of the two. There can be no doubt that they did when these railroads were laid out, or that the advent of automobiles has given them an additional claim to consideration. *291 They always are the necessity of the whole public, which the railroads, vital as they are, hardly can be called to the same extent. Being places to which the public is invited and that it necessarily frequents, the State, in the care of which this interest is and from which, ultimately, the railroads derive their right to occupy the land, has a constitutional right to insist that they shall not be made dangerous to the public, whatever may be the cost to the parties introducing the danger. That is one of the most obvious cases of the police power, or to put the same proposition in another form, the authority of the railroads to project their moving masses across thoroughfares must be taken to be subject to the implied limitation that it may be cut down whenever and so far as the safety of the public requires. It is said that if the same requirement were made for the other grade crossings of the road it would soon be bankrupt. That the States might be so foolish as to kill a goose that lays golden eggs for them, has no bearing on their constitutional rights. If it reasonably can be said that safety requires the change it is for them to say whether they will insist upon it, and neither prospective bankruptcy nor engagement in interstate commerce can take away this fundamental right of the sovereign of the soil. Denver & Rio Grande R.R. Co. v. Denver, 250 U.S. 241, 246, 39 Sup.Ct. 450 [452], 63 L.Ed. 958. To engage in interstate commerce the railroad must get on to the land and to get on to it must comply with the conditions imposed by the State for the safety of its citizens. Contracts made by the road are made subject to the possible exercise of the sovereign right. [254 U.S. at 410-411, 41 S.Ct. at 171, 65 L.Ed. at 333-334]
In New York v. Gebhardt, 151 F.2d 802 (2 Cir.1945), cert. den. 327 U.S. 788, 66 S.Ct. 808, 80 L.Ed. 1015 (1946), Judge Clark wrote the opinion affirming the orders of the bankruptcy court giving priority to the claim of the State of New York pursuant to a statute providing for priority over mortgages for costs incurred by that state in eliminating grade crossings at railroad tracks. The court noted:
The statute does not impair the obligation of appellants' mortgage contracts within the constitutional prohibition. Grade crossing elimination has long been accepted as a valid exercise of the police power; and this statute has already been sustained on that ground, as well as the others, against attack by the mortgagor railroad. Re New York, O. & W.R. Co., 244 App.Div. 664, 280 N.Y.S. 174, affirmed In re Grade Crossing of New York, O. & W. Ry. at East Senecca St. in City of Oswego, 271 N.Y. 567, 3 N.E.2d 188. It is of course settled that a state may modify contract rights in the legitimate exercise of its police power. [Id. at 805-806][3] *292

*293 In Gebhardt, supra, the court also cited with approval Thornton v. Chase, 175 Misc. 748, 23 N.Y.S.2d 735 (S.Ct. 1940). There the court held that pursuant to statute and regulation the City of New York had priority for a demolition lien over a prior recorded mortgage. The court rejected the contentions that the statute impaired the mortgage contract or deprived the holder of property without just compensation. The Court said:
The term "police power" has been said "to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance." Lawton v. Steele, 152 U.S. 133, 136, 14 S.Ct. 499, 500, 38 L.Ed. 385. The statute, pursuant to which the building upon the mortgaged property was demolished, is obviously a police power measure designed to abate "a public nuisance". See In the Matter of City of New York v. Unsafe Building, Nos. 216, 218, 220 Broome St., 130 App.Div. 396, 402, 114 N.Y.S. 1018. That this is so was clearly recognized in Central Savings Bank in City of New York v. City of New York, supra, wherein the Court specifically stated that buildings which are a public nuisance may "in the interest of public health or welfare" be demolished (279 N.Y. [266] at pages 279 and 281, 18 N.E.2d [151] at page 156, 121 A.L.R. 607).

*294 As for the provision which gives the lien of the judgment for demolition costs "priority before any mortgage or other lien as may exist * * * except tax and assessment liens", I am of the opinion that it is not unconstitutional. As said in Health Department of City of New York v. Rector, etc., of Trinity Church, 145 N.Y. 32, 43, 39 N.E. 833, 836, 27 L.R.A. 710, 45 Am.St.Rep. 579: "Laws and regulations of a police nature, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury, it is either damnum absque injuria, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure. [23 N.Y.S.2d at 738]
In Application of Bidias, 208 Misc. 757, 143 N.Y.S.2d 346 (Sup.Ct. 1955), the court held that an assignee of a mortgage seeking foreclosure was subject to the priority of the municipality's claim for demolition over the mortgage pursuant to statute. The court observed:
Mortgagees as well as owners hold their interest in property subject to the proper exercise of the police power. A prudent mortgagee sees to it not only that taxes and assessments are paid but that the building is not permitted to become so dangerously in disrepair as to require demolition. If, through the owner's and his neglect, it becomes necessary to demolish, he may neither complain that he might have been able, had personal notice been given him, to so repair as to make the building safe, nor object to priority being accorded the actual demolition cost advanced by the city, in view of the failure to undertake such demolition by anyone interested in the property, including himself. [Id. at 349][4]
*295 In the New York cases mentioned immediately above, the courts cited but did not follow Central Savings Bank v. City of New York, 279 N.Y. 266, 18 N.E.2d 151, 121 A.L.R. 607 (Ct.App. 1938), amended 280 N.Y. 9, 19 N.E.2d 659, cert. den. 306 U.S. 661, 59 S.Ct. 790, 83 L.Ed. 1058 (1939). It is distinguishable on its facts. The Court of Appeals held that the provision of a statute that gave the City of New York a paramount lien over prior mortgages for amounts spent by the city to improve tenement houses was invalid in that it violated the Due Process of Law Clause and the Impairment of Contract Clause of the Constitutions of the United States and the State of New York.
That court recognized that the legislature had the power to compel the owner to bring the building into compliance with the new tenement code or close the building. The expenditures by the owner to bring the building into compliance would not create a lien ahead of the mortgage. However, if the owner did not bring the tenement into compliance, the city was authorized to give notice, including notice to the mortgagee, and to proceed to do the work after a stated period if the owner did not. Thereafter the city was to file an affidavit of the amount spent and obtain a paramount lien. The court concluded that the statute permitted the owner to have the improvements made, collect the rents and downgrade the first mortgage to a second mortgage by having the city do the work.
The New York court said:
... If the building is dangerous or unsuitable, the city, in the interest of the public health or welfare, may close it up or restrict its use even, or, where *296 dangerous, demolish it; but it cannot compel the owner to keep it for a specific use. [18 N.E.2d at 156]
The court went on to say that it recognized the authorities holding that mortgages may be subordinated to liens for water rents where others had agreed to pay such charges. It differentiated those cases on the grounds that mortgagees have to expect such regulations. But it said under mortgage provisions, mortgagors are supposed to maintain their properties and hence mortgagees do not have to expect these type of regulations.
The Administrator's lien was the subject of proof submitted in the case cited in footnote 1. The original complaint, as amended, sought such relief if the owner did not clean up the hazard. After a hearing with live testimony as to the imminent danger of fire, the toxic and explosive material found on the premises, the dangerous condition of heaters and wiring in the building which lacked safety features to make them nonexplosive, the nature of the operations on the premises with rusting and leaking drums as well as spillage allowing toxic materials to enter sewers and ground, and the proximity of the operation to occupied homes and a public high school with many hundreds in attendance, Daniel Tarrats signed a consent order to clean up the premises in accordance with detailed safety standards and a timetable. When the order was not complied with, DEP then applied to do the work itself under N.J.S.A. 58:10-23.11f(a) with funds provided by the Administrator.
There was a finding of a condition of imminent danger, nuisance, presence of hazardous and toxic materials under the standards of the statute, and conditions of storage of explosive material without permits from Paterson's fire department.
This court concludes that both Paterson and the State were not seeking to improve the property and continue its use in a lawful manner as the facts in Central Savings Bank, supra, suggest. Both were seeking to stop an unlawful use and abate a nuisance dangerous to life, health and adjoining properties. This they had a right to do. See Transportation Dept. v. PSC *297 Resources, Inc., 175 N.J. Super. 447 (Law Div. 1980); cf. Bridgeton v. B.P. Oil, Inc., 146 N.J. Super. 169 (Law Div. 1976). As stated above, the premises had become a nuisance and contained those substances declared hazardous and toxic under N.J.S.A. 58:10-23.11 et seq.
There is no need to speculate whether Kessler, Carshel, Foam Craft, Inc. or 190  16th Avenue Corp. would have any liability under N.J.S.A. 58:10-23.11 et seq. if any of them had taken possession of the subject premises under rights based on the mortgage. No one asserted such a right before the State's action to clean up was well under way. Cf. Environmental Protection Dep't v. Exxon Corp., 151 N.J. Super. 464 (Ch.Div. 1977) (stranger purchasing oil polluted land not liable for clean up costs under an earlier version of N.J.S.A. 58:10-23.11 et seq.).
Any person who took possession of the subject premises while it contained toxic and hazardous substances, while it contained highly flammable materials, and while it lacked basic safety features, would be exposed to common law liability for injuries to persons on the premises and those on sites adjoining it. In addition, the possessor would have a similar exposure to the owners of property located on said adjoining premises. See Bridgeton v. B.P. Oil Co., Inc., 146 N.J. Super. 169, 173-175 (Law Div. 1976) (discussion of liability of owner of land with hazardous material or activity thereon for injury to persons and adjoining property owners). See, also, B.W. King, Inc. v. West New York, 49 N.J. 318, 326-328 (1967) (discussion of liability of municipality which acquired title to an abandoned coal pier through tax foreclosure for fire damage to adjoining property owners); Restatement, Torts 2d, § 839 (1979).
The cost of removal of toxic and hazardous material on the subject premises has been great in amount. The contents of each unmarked drum had to be tested to determine what it contained. This was necessary to determine where the material could be shipped for disposal. The workers doing the work had *298 to wear protective clothing. Supervision to coordinate fire, police and utilities service was necessary. The wiring and fixtures in the premises were not explosion proof; hence, the fire department insisted the utilities be turned off to protect against vandals entering the premises and causing an explosion when workers were not present. The asserted amount of the lien is $274,581.43. The amount claimed due on the mortgage is $18,900.38, together with interest from August 21, 1981.
The presence of the material in a real sense destroyed what economic value the premises may have had until it was removed. In Faitoute Iron and Steel Corp. v. Asbury Park, 316 U.S. 502, 62 S.Ct. 1129, 86 L.Ed. 1629 (1942), the Supreme Court held valid the New Jersey statutes empowering the Municipal Finance Commission to reorganize an insolvent municipality, including a power to issue new bonds with an extended maturity and at a different interest rate in exchange for outstanding bonds upon which payment for interest and principal had not been made. The bonds were outstanding prior to the enactment of the subject statute. Justice Frankfurter said:
The Constitution is "intended to preserve practical and substantial rights, not to maintain theories." Davis v. Mills, 194 U.S. 451, 457, 24 S.Ct. 692, 695, 48 L.Ed. 1067. Particularly, in a case like this are we in the realm of actualities and not of abstractions and paper rights, of what things are worth in dollars and cents, and in what is proposed to realize paper values. "The question whether the remedy on this contract was impaired materially is affected not only by the precarious character of the plaintiff's right, but by considerations of fact,  of what the remedy amounted to in practice." Pittsburgh Steel Co. v. Baltimore Eq. Soc., 226 U.S. 455, 459, 33 S.Ct. 167, 168, 57 L.Ed. 297. This was said of the claim of a creditor of a private corporation. How much more pertinent is it to claims of these appellants against the municipality of Asbury Park in the circumstances before us. To say that the right of the Asbury Park bond-holders in 1935 was a precarious character is pure understatement. And we have already seen how empty was the remedy with which to enforce that right. [316 U.S. at 514-515, 62 S.Ct. at 1135-1136]
Justice Frankfurter noted that the case did not involve secured claims and mentioned Doty v. Love, 295 U.S. 64, 55 S.Ct. 558, 79 L.Ed. 1303 (1935), and State v. Fort Lee, 14 N.J. Misc. 895, 188 A. 689 (Sup.Ct. 1936). In the latter case the New Jersey Supreme Court held that where funds had been collected, or *299 there was an ability to tax, then tax anticipation notes which had been issued with a pledge of tax receipts as security had to be paid ahead of other claims. In Doty, supra, Justice Cardozzo noted that liens against good collateral were recognized under Missouri's bank reorganization statute. There the Supreme Court held the statute valid against a claim that the statute in question as applied to the facts of the case, rather than facially, impaired the contract rights of depositors because it permitted the payment in full of deposits below five dollars and in a practical sense released claims for personal liability against the shareholders of the closed bank. Justice Cardozzo said that the savings on bookkeeping costs of the small deposits warranted paying them in full. In respect to the claim against the old shareholders, the record reflected they were of dubious value and would be expensive to try to collect. Justice Cardozzo concluded that a judicially approved compromise was not an impairment of contract.
Kessler has also urged that the statute is oppressive and will be retroactive in operation, based on In re Kaplan, 178 N.J. Super. 487, 495 (App.Div. 1981). This court makes no comment about that case except to say it is not applicable on these facts. N.J.S.A. 58:10-23.11b(13), which makes the act applicable to discharges before its enactment, makes clear the Legislature's intent that the statute was to have a retroactive application; hence, the question of legislative intent presented in Kaplan is not at issue here. The text of the lien provision quoted above clearly states that the lien created by the statute is to be prior to "all other liens." This necessarily means those established prior to the enactment of the statute. That expectation of persons are changed by the enactment of laws is not a sufficient ground to find that a statute changing the expectation is an impairment of a contract within the constitutional prohibition. Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); In re Kaplan, supra, 178 N.J. Super. at 495.
*300 The statute does not reflect the attitude or purpose of recklessly destroying a lien claim. In W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56, 55 S.Ct. 555, 79 L.Ed. 1298 (1934), Justice Cardozzo held the legislation there attacked was invalid as an impairment of contract and said:
... A catalogue of the changes imposed upon this mortgage must lead to the conviction that the framers of the amendments have put restraint aside. With studied indifference to the interests of the mortgagee or to his appropriate protection they have taken from the mortgage the quality of an acceptable investment for a rational investor.
Under the statutes in force at the making of the contract, the property owner was spurred by every motive of self-interest to pay his assessments if he could, and to pay them without delay. Under the present statute he has every incentive to refuse to pay a dollar, either for interest or for principal. [Id. at 60-61, 55 S.Ct. at 557, 79 L.Ed. at 1301-1302]
As reflected in the legislative history, the Legislature was aware of a grave health problem, dangerous toxic conditions, hazardous conditions (e.g., the Chemical Control Co. waste dump that exploded, burned and spewed poisonous gases into the atmosphere), great expense, and the problem of adequate funding. See Public Hearing on Assembly Bill 3542, October 10, 1979, at 13 in particular. The Legislature's objectives were to eliminate these conditions, to provide the funds to do so, and to provide for the recapture of public funds so used. The Legislature did not seek merely to delay or destroy mortgages.
In Gibraltar Factors Corp. v. Slapo, supra, 23 N.J. at 464, Justice Jacobs commented on the number of statutes that gave priority to liens created by statute over other security interests and pointed out that they had been held constitutional against attacks usually on arguments based on lack of due process of law.
In Provident Savings Inst. v. Jersey City, supra, the Supreme Court suggested that for important public purposes it might well be that a state pursuant to a lawful exercise of its police power could grant itself a lien which would have priority over liens established by contract before the enactment of the statute. Justice Bradley analogized such liens to the liens developed *301 in admiralty and under the common law to artisans and mechanics whose work improved or preserved property.
The problem presented herein differs in several respects from the issues concerning the Legislature's ability to change the contract of a state agency with the agency's bondholders considered in United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and Fidelity Union Trust Co. v. N.J. Highway Auth., 85 N.J. 277 (1981), app. dism. 454 U.S. 804, 102 S.Ct. 76, 70 L.Ed.2d 73 (1981).
In United States Trust Co., supra, Justice Blackmun, writing for the majority, concurred with the holding of the courts below that there was an impairment of the bondholders' contract by enactment in 1974 of a statute repealing a statute which was enacted in 1962 that limited use of the general reserve fund of the Port Authority of New York and New Jersey to cover "permitted deficits" in mass transit operations. The effect permitted the invasion of the previously secured general reserve fund. The majority rejected the argument that the objective of shifting commuters from using private automobiles to using mass transit facilities to save energy and reduce pollution met the test of an impairment of a contract being "constitutional if it is reasonable and necessary to serve an important public purpose." 431 U.S. at 25, 97 S.Ct. at 1519. The majority concluded that there was no necessity to impair the contract to attain the objective because there were other reasonable alternatives available. El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965), in which the action of Texas in shortening the period of redemption for terminating contracts of purchase from a state agency to five years from what in practice was an open-ended period of redemption, was distinguished. The means chosen there was a reasonable one to limit windfall profits to speculators and yet permit persons with a contract to realize those gains to be expected when the contract was made. The only means that could be used was a shorter period of redemption.
*302 In Fidelity Union Trust Co., supra, Justice Schreiber found that L. 1973, c. 370, § 1, which amended N.J.S.A. 27:12B-4 and was enacted after the bonds in question were issued, should not be construed as impairing the contract of the holders of the bonds. The relevant portion of the statute provided:
No resolution or other action of the authority providing for ... the fixing, revising, or adjusting of tolls for the use of any highway projects or parts or sections thereof shall be adopted or otherwise made effective by the authority without the prior approval in writing of the Governor and at least one of the following: the State Treasurer and the Comptroller of the Treasury. The powers conferred in this section upon the Governor, the State Treasurer and the Comptroller shall be exercised with due regard for the rights of the holders of bonds of the authority at any time outstanding, and nothing in, or done pursuant to, this section shall in any way limit, restrict or alter the obligation or powers of the authority or any representative or officer of the authority to carry out and perform in every detail each and every covenant, agreement or contract at any time made or entered....
The relevant provisions of the bond covenants were summarized by the court as follows:
The Authority was given specific power to accomplish these purposes. Included were the power to fix, revise and collect tolls, N.J.S.A. 27:12B-5(i), and the authorization to issue bonds and notes to be secured by a pledge of all or any part of its tolls or revenues, N.J.S.A. 27:12B-9(a)(i). Furthermore, it was authorized to include a covenant with respect to the toll rates "to be established and charged" in a contract with the proposed security holders. N.J.S.A. 27:12B-9(a)(viii). The State pledged to all future holders of the bonds that it would not limit or restrict the rights vested in the Authority "to establish and collect such tolls or other charges as may be convenient or necessary to produce sufficient revenues to meet the expenses of maintenance and operation ... and to fulfill the terms of any agreements made with the holders of bonds or notes ... or in any way impair the rights or remedies of the holders...." N.J.S.A. 27:12B-11. Moreover, the tolls were not to "be subject to supervision or regulation by any other commission, board, bureau or agency of the State." N.J.S.A. 27:12B-14. [85 N.J. at 283]
Justice Schreiber stated that the tests to be applied to determine if there was an impermissive impairment of contract were:
In summary, then, the United States Trust and [Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)] cases suggest the following analyses for our purposes. (1) What were the terms of the agreement between the parties? (2) Was there an impairment of a financial condition of the contract? (3) If so, was it substantial? (4) Since the contract was with the State, did the State have the ability to limit its power to act in the future with *303 respect to the administration of the New Jersey Highway Authority Act? [Id. 85 N.J. at 289]
The court held that the Legislature could not contract away its power to change the administration of the agency or transfer its power to others in the State's government. The court held that there was no impairment. It said:
None of these requirements for the financial security of the bondholders were diminished by the 1973 amendment. Though procedurally the Governor and the state treasurer or comptroller of the treasury were called upon to approve toll adjustments, these officers could exercise that power only
with due regard for the rights of the holders of bonds of the authority at any time outstanding, and nothing in, or done pursuant to, this section shall in any way limit, restrict or alter the obligation or powers of the authority or any representative or officer of the authority to carry out and perform in every detail each and every covenant, agreement or contract at any time made or entered into by or on behalf of the authority with respect to its bonds or for the benefit, protection or security of the holders thereof. [N.J.S.A. 27:12B-4]
Thus it is incumbent on the Governor and the state treasurer or comptroller to comply with the idential toll adjustment provisions of the bond resolution. They have precisely the same obligations as the Authority members to protect the bondholder's rights. At most there has been a change in the identity of the individuals charged with assuring that the interest of the bondholders and the public in toll adjustments is safeguarded. There has been no substantive alteration in the terms of the bonds. Thus if the revenues do not meet the 120% test, the tolls must be adjusted substantially to those prescribed by the engineer's certificate irrespective of the identity of those in charge. [Id. at 294]
Since the Supreme Court concluded that the Governor and the State Treasurer or Comptroller must approve a toll increase if the 120% test is not met, any discretion which the Legislature intended to give by its language in the statute is mandatory and hence there is no violation of the bondholders covenant.
Justice Schreiber also said that U.S. Const., Art. I, § 10, and N.J. Const. (1947), Art. IV, § VII, par. 3, are parallel guarantees although they differ in language. Id. at 299. Therefore, in suits by private parties the inquiry is limited to whether there was a substantial impairment and whether the Legislature validly exercised the police power.
This case presents no question of the power of a State to give by contract security to those to whom it sells bonds. This case *304 presents only a question of the Legislature's use of the police power and taxing power.
Kessler urges that the priority provision of the lien for the Administrator for the Fund is not necessary because the Legislature has provided a means of funding the work of the DEP by a tax on the operation of major facilities. See N.J.S.A. 58:10-23.11h. Hence, the situation is not analogous to Paterson v. Fargo Realty, 174 N.J. Super. 178 (Cty.D.Ct. 1980), where the court said that unless Paterson were able to recover the demolition costs from the owner, Paterson would not have sufficient funds to carry on the work. Here, Kessler urges that the Legislature could raise the tax.
Kessler further urges that he, like many mortgagees, lacked knowledge of what was going on and will lose his security. Further, there is no logical relationship between subordinating his lien and furthering the funding for the work of cleaning up hazardous and toxic waste material.
As recited above, while Carshel had enforceable rights against Foam Craft, Inc. to protect its partners from advancing funds to pay its debt, and 190  16th Avenue had an ability to seek restraint against an illegal activity on the subject premises, neither paid any attention to the subject premises nor the taxes due Paterson. While they stayed quietly away, those on the premises created the nuisance and hazards which the State had to abate and eliminate with public funds.
The work done by DEP had the effect of restoring the economic value to the subject premises and relieving the potential owners and possessors of the premises of common law liabilities. Such potential owners and possessors include Kessler and other holders of liens against the premises. Subject to the limitations set forth in N.J.S.A. 58:10-23.11 et seq., the Legislature has determined that the costs to the public for restoring economic value to the premises should be repaid so that the public fund is replenished for work at other sites. N.J.S.A. 58:10-23.11g. By providing that the Fund be paid first, the *305 Legislature had not destroyed Kessler's security. The Legislature has said that before Kessler and others may enjoy the benefit of the economic values which the DEP created the public should first be paid.
Before the DEP acted, Kessler and the other holders of liens had "paper rights" which had no real value. The public, as represented by the Administrator for the Fund, in logic and fairness should have a prior claim just as admirality awarded a priority claim to those who aided a ship or the common law granted a priority to the mechanic who added or preserved value to property. In a realistic sense, the priority provision prevents some from enjoying a windfall at the expense of the public.
As observed in Paterson v. Fargo Realty Inc., supra:
The validity and constitutionality of a statute is presumed and the burden is on the party challenging it to prove otherwise. Ballou v. State, 148 N.J. Super. 112, 121, 122 (App.Div. 1977), aff'd 75 N.J. 365 (1978); Jamouneau v. Harner, 16 N.J. 500, 515 (1954), cert. den. 349 U.S. 904, 75 S.Ct. 580, 99 L.Ed. 1241 (1955). Such an enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt. Brunetti v. New Milford, 68 N.J. 576, 599 (1975); Harvey v. Essex Cty. Freeholders Bd., 30 N.J. 381, 388 (1959). Moreover, this court is cognizant of the better practice in presuming an act to be constitutional until it has been passed upon by an appellate court. Shanley v. Nuzzo, 160 N.J. Super. 436, 439-440 (J. & D.R.Ct. 1978); Three L Corp. v. Newark Bd. of Adj., 118 N.J. Super. 453, 455 (Law Div. 1972). [174 N.J. Super. at 191]
This court concludes that N.J.S.A. 58:10-23.11f(f) as to Kessler and other holders of liens claims against the subject premises is not invalid under U.S. Const., Art. I, § 10, or N.J. Const. (1947), Art. IV, § VII, par. 3. The Legislature validly exercised the police power to provide a means to abate dangerous conditions to life, health and property and to help assure that those who might derive a windfall are subordinated to the claim of the public for reimbursement before they do. The priority provision does not destroy or even impair any right of Carshel or Kessler as assignee against Foam Craft, Inc.
Kessler urges that N.J.S.A. 58:10-23.11 et seq. is invalid in that he is not provided with notice and an opportunity to be heard before his lien is subordinated to that of the Administrator. *306 He further urges that he never has received any notice and has had no opportunity to be heard.
Administrator urges that Kessler had constructive notice by reason of the massive local news coverage of the cleanup and that under N.J.S.A. 58:10-23.11n provision is made for a person in interest to contest before a board of arbitrators the amount of costs incurred by the Fund and damage claims; hence, under N.J.S.A. 58:10-23.11q, the Administrator in a separate action need only prove that the discharger was responsible.
This court agrees with the contention of the Administrator that insofar as the original action to force the discharger to undertake the clean up or for the DEP to do the work the holders of liens against the property are not necessary parties. If the alleged discharger does the work, lien holders are not affected, because the priority provision applies only where the New Jersey Spill Compensation Fund expends money. See N.J.S.A. 58:10-23.11f(f). Where the discharger is unknown, the priority provision does not apply because N.J.S.A. 58:10-23.11f(f) only creates a lien against the "property of the discharger...." If the discharger is unknown, then by definition the Administrator can have no priority because the discharger cannot be proved.
In Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894), Justice Brown for the majority upheld a New York statute that permitted the destruction of fish nets as a nuisance in circumstances where the legislature had restricted the taking of fish of certain species to hand-held poles. The destruction of the fish nets was permitted without notice to the owners on the grounds that they were a nuisance. The court noted:
The main, and only real, difficulty connected with the act in question, is in its declaration that any net, etc., maintained in violation of any law for the protection of fisheries is to be treated as a public nuisance, "and may be abated and summarily destroyed by any person; and it shall be the duty of each and every protector aforesaid and every game constable, to seize, remove, and forthwith destroy the same." The legislature, however, undoubtedly possessed the power not only to prohibit fishing by nets in these waters, but to make it a criminal offense, and to take such measures as were reasonable and necessary to *307 prevent such offenses in the future. It certainly could not do this more effectually than by destroying the means of the offense. If the nets were being used in a manner detrimental to the interests of the public, we think it was within the power of the legislature to declare them to be nuisances, and to authorize the officers of the state to abate them. Hart v. Albany, 9 Wend. 571, 24 Am.Dec. 165; Meeker v. VanRensselaer, 15 Wend. 397. An act of the legislature which has for its object the preservation of the public interests against the illegal depredations of private individuals ought to be sustained, unless it is plainly violative of the Constitution, or subversive of private rights....
While the legislature has no right arbitrarily to declare that to be a nuisance which is clearly not so, a good deal must be left to its discretion in that regard, and if the object to be accomplished is conducive to the public interests, it may exercise a larger liberty of choice in the means employed. Newark & S.O.H.C.R. Co. v. Hunt, 50 N.J.L. 308; Blazier v. Miller, 10 Hun. 435; Mouse's Case, 12 Coke 62; Stone v. New York, 25 Wend. 173; American Print Works v. Lawrence, 21 N.J.L. 248, 23 N.J.L. 590, 57 Am.Dec. 420. [152 U.S. at 139-140, 14 S.Ct. at 502]
In Newark and South Orange Horse Car R. Co. v. Hunt, 50 N.J.L. 308 (Sup.Ct. 1888), cited in the quotation above, the then Supreme Court held valid a statute permitting the State Health Department to destroy certain animals with contagious diseases before notice and opportunity to be heard to the owners against an attack that said statutes deprived the owners of the animals of their property without due process of law. That court said that the demurrer to the answer which pleaded defendants acted as officers of the State Health Department admitted the allegations that the horses had the disease alleged. In holding that under the police power the Legislature had power to authorize the abatement of nuisances in a summary manner, the New Jersey court said:
Plaintiff, however, contends that the determination of the officials that the prescribed disease exists is to be made without notice to the property owners and without affording them an opportunity to be heard, and on this ground claims that these acts are obnoxious to the constitutional provision invoked. If the legislature by these acts has made the determination of these officials, as to the existence of the common nuisance, a conclusive adjudication upon the rights of the property owner, then it is perfectly obvious that this legislation cannot be supported. It has been settled in this state that it is not within the power of the legislation to impart to a determination of this sort a conclusive character as against the property owner, and legislation intending that result was held to be futile. Hutton v. Camden [39 N.J.L.], 10 Vroom 122.

*308 An examination of the acts in question clearly shows that there was no intent in the legislative mind to make the conclusions of the officials decisive of the right of the property owner as to the existence of that condition of things which these acts declared would constitute, in these cases, a common nuisance, and would justify its abatement by the destruction of the animals diseased. The right of the property owner is not thereby barred, on the one hand, nor is the justification of the officials made effective, on the other hand, by reason of their adjudication, but by reason of the fact that the common nuisance declared by the acts existed, and so existed as to permit the officials to exercise the power of abatement. What the acts authorize is the abatement of an actual nuisance. They afford no protection to any invasion of the rights of property in any other case.
There is nothing in the decision in Hutton v. Camden, supra, or in the learned and well-considered opinion of the Chief Justice, which gives the least countenance to the notion that the legislature may not authorize the abatement of a common nuisance until after its character as a nuisance has been determined in a judicial proceeding, with the safeguards of notice and opportunity to the property owner to be heard. Such a doctrine enforced by the courts would interpose an almost absolute barrier to the praiseworthy efforts everywhere made to prevent preventible diseases and to stamp out contagion and infection affecting public health and comfort, and would render much of the health legislation of to-day of no avail. But I think it cannot be claimed that the rights of a property owner will be improperly interfered with by legislation authorizing the abatement of nuisances of this character, although in advance of a judicial adjudication, provided such an adjudication and full opportunity to be heard is not denied, but may be evoked and compelled. As has been said in this court, every property owner holds the title to his property subject to the paramount consideration of the health and safety of the public, and the power of the legislature to fix upon it, when in certain conditions, the brand of noxiousness to public safety or health. [Id. 50 N.J.L. at 314-315]
The two-step procedure; i.e., abatement followed by notice and, where circumstances demand, an opportunity to be heard is still acceptable. See Callen v. Sherman's Inc., 92 N.J. 114, 137 (1983). See, also, authorities collected in Thain v. Palo Alto, 207 Cal. App.2d 173, 24 Cal. Rptr. 515, 524-525 (D.Ct.App. 1962).
The court concludes that no notice need be given to the lien holders before the abatement occurs.
N.J.S.A. 58:10-23.11j authorizes the Administrator to represent the State in dealings with the alleged discharger and claimants seeking compensation. Where the Administrator cannot work out a settlement for damages and/or cleanup and removal costs, he is authorized to use an arbitration process to *309 have disputes as to liability and/or amounts resolved. N.J.S.A. 58:10-23.11n.
N.J.S.A. 58:10-23.11b(d) states in relevant part:
"Cleanup and removal costs" means all costs associated with a discharge incurred by the State or its political subdivisions ... with written approval from the department [DEP] in the (1) removal or attempted removal of hazardous substances or, (2) taking of reasonable measures to prevent or mitigate damages to the public health, safety or welfare....
The provision in N.J.S.A. 58:10-23.11f(f) that "[a]ny expenditures made by the administrator pursuant to this act shall constitute a first priority claim" must be read in context with the provision for resolving a dispute about the amount of the claim provided for in N.J.S.A. 58:10-23.11n and other provisions for recovery of clean-up costs and damages.
The DEP is the state agency that expends the money although the Administrator pays the amount from the Fund.
Under N.J.S.A. 58:10-23.11k the Administrator is required to inform as soon as practicable "all affected parties" of the filing of a claim after a discharge. "Affected parties" is not defined by the statute.
There is no evidence that the Administrator gave notice to any of the lien holders under N.J.S.A. 58:10-23.11k. The regulations under N.J.A.C. 17:26-1.1 et seq. do not contemplate any notice to holders of liens that may be displaced.
If the statute is considered only as an implementation of the State's taxing power, it can be urged that no notice need be given. It is true that a mortgagee or other lien holder need not be given notice of a special assessment proceeding which may give rise to a lien in favor of a government paramount to an existing mortgage. Such a proceeding does not deny the holder of any constitutional rights. See Fitchpatrick v. Botheras, 150 Iowa 376, 378, 130 N.W. 163 (Sup.Ct. 1911); 63 C.J.S., Municipal Corporations, § 1401e (1950) ("Mortgagees or lienholders, or other persons having an interest in the property [other than owners] that may be affected by an assessment, are not entitled *310 to notice and hearing"). Cf. Maier v. Caffrey, 11 N.J. Misc. 313, 165 A. 721 (Sup.Ct. 1933). The rationale is that special assessments are an extension of the general taxing power of a state for which a legislature may lawfully give a priority.
The fact that the Legislature authorizes tax funds to do the work initially and then seeks to recoup the funds by means of a prior lien has been held to be a matter of legislative choice in the area of special assessments. Jellif v. Newark, 48 N.J.L. 101, 109 (Sup.Ct. 1886), aff'd o.b., 49 N.J.L. 239 (E. & A. 1886).
Even if the statute is construed to be one not resting on the Legislature's taxing power and hence the lienholders are entitled to notice and opportunity to be heard, the statute does not violate accepted standards of due process of law under either the United States Constitution or the 1947 Constitution.
In N.J.S.A. 58:10-23.11x the Legislature has stated that:
This act, being necessary for the general health, safety, and welfare of the people of this State, shall be liberally construed to effect its purposes.
Also, N.J.S.A. 58:10-23.11v states that:
Nothing in this act shall be deemed to preclude the pursuit of any other civil or injunctive remedy by any person. The remedies provided in this act are in addition to those provided by existing statutory or common law, but no person who receives compensation for damages or cleanup costs pursuant to any other State or Federal law shall be permitted to receive compensation for the same damages or cleanup costs under this act.
"Person" as defined in N.J.S.A. 58:10-23.11b includes the "State of New Jersey and of its political subdivisions or agents."
By reason of the provisions of settlement and arbitration found in N.J.S.A. 58:10-23.11l to n, the Administrator in many cases will find that the amounts of claims and damages will be fixed prior to a recoupment action. N.J.S.A. 58:10-23.11q then provides that the Administrator is to seek reimbursement from the alleged discharger in the following language:
Payment of any cleanup costs or damages by the fund arising from a single incident shall be conditioned upon the administrator acquiring by subrogation all rights of the claimant to recovery of such costs or damages from the discharger or other responsible party. The administrator shall then seek satisfaction from the discharger or other responsible party in the Superior Court if the discharger *311 or other responsible party does not reimburse the fund. In any such suit, except as provided by section d. of section 8 of this act, the administrator need prove only that an unlawful discharge occurred which was the responsibility of the discharger or other responsible party. The administrator is hereby authorized and empowered to compromise and settle the amount sought for costs and damages from the discharger or other responsible party and any penalty arising under this act.
Where the amount has previously been agreed upon or has been the subject of arbitration, the Administrator in the recoupment action would only have to prove the fact of discharge. The court notes that the review of arbitration awards is in the Appellate Division. The Legislature has not chosen to make the award enforceable under the regular arbitration act, N.J.S.A. 2A:24-16. This court construes this section to be an enforcement section for the arbitration awards.
The court notes that direct claims are permitted against persons who provide "financial responsibility" for those licensed under the act. N.J.S.A. 58:10-23.11s. In such proceedings, the claimants would have to prove who was responsible for the discharge and damages.
The court construes N.J.S.A. 58:10-23.11v to be applicable where neither of the other provisions are.
In short, the Legislature has directed that all efforts to collect from the discharger must be brought through the courts. Except in the actions to enforce arbitration awards, the Administrator is not relieved of any burden of proving the necessary elements of a case; i.e., who was responsible for the discharge and the amount thereof.
As pointed out in Security Trust Co. & Storage Vault v. Lexington, 203 U.S. 323, 27 S.Ct. 87, 51 L.Ed. 204 (1906), the requirements of due process of law are met so long as a person has notice and opportunity to be heard in a court before a state authority may enforce a tax or revenue lien against that person's property. In New Jersey, the rules of court are an essential consideration in respect to notice and affected parties. See Atlantic City v. Block C-11, Lot 11, 74 N.J. 34, 40 (1977). *312 The rules require the joinder of all necessary parties, R. 4:28; provide for service of process, R. 4:4-4; time to answer, R. 4:6-1; and a trial, R. 4:35-1 et seq., subject to applicable rules.
In the case referred to in footnote 1, the Administrator did not join the holders of liens but did submit proof as to the amount of the clean-up costs and the evidence as to Tarrats' discharge. Thereafter, the Administrator asserted the lien.
There is no fatal error. Kessler has joined in all lienholders from the date of his mortgage, which is also the date Carshel took title to the property. The Administrator has asserted the amount of his claim by means of counterclaim and crossclaims and served all lienholders in the foreclosure action. Therefore, all have notice of the claim and the basis for it.
There is no problem presented here of the conflict between N.J.S.A. 2A:50-2 which prevents a plaintiff in a mortgage foreclosure from obtaining a money judgment against a defendant and a counterclaimant from seeking a money judgment and instituting a third-party action to recover such a judgment. Cf. Leisure Technology v. Klingbeil, 137 N.J. Super. 353 (App.Div. 1975).
The Administrator seeks here only to establish the lien and assert its priority to the extent of the amount of the lien. Although controversies concerning priorities may be resolved in proceedings for surplus monies, see R. 4:64-2, the parties hereto have requested that it be done in advance of sale so that the bidders will know what amount is necessary in order to obtain title. The problem presented is one which is appropriate for a foreclosure proceeding where disputes concerning priority are resolved.
Paterson having been a party to the prior action wherein the Administrator filed proofs, is bound by the judgment therein. The other lienholders are not bound by the prior proceedings. If they advise the court and the Deputy Attorney General by letter within 15 days of the date of this decision that they want a hearing to contest either the amount expended by the Administrator *313 or that Tarrats was the discharger, then the court will fix a time for review of the proofs and a hearing. If any of the lienholders do not want a hearing, the court requests that counsel for such lienholder or lienholders so advise the court by letter within the same 15-day period.
In summary, the court concludes that N.J.S.A. 58:10-23.11f(f) does create a lien in favor of the Administrator for the benefit of the fund against the property of "the discharger." The court concludes that as against the "discharger" the Administrator must establish that such person was responsible for the discharge in an action to enforce the lien except where that fact has been previously admitted or settled by arbitration.
The court further concludes that an action to enforce the lien and assert its priority the Administrator must join such persons as will be affected by the enforcement of the lien and establish that the owner of the property against which the lien is sought to be imposed is the discharger and the amount expended by the Administrator. As so construed, N.J.S.A. 58:10-23.11 et seq., together with the Rules of Court facially provides to prior lienholders their rights secured to them under the concepts of due process of law.
As applied in the context of this action, subject to the right to hearing mentioned above for those not in default, the court concludes that the lienholders will have been afforded notice and opportunity to be heard as required by the concepts of due process of law. See Security Trust Co. & Storage Vault Co., supra.
In respect to the claim of Paterson for priority for real estate taxes, the Legislature in N.J.S.A. 58:10-23.11g(a)(4) gave to municipalities a claim for loss of revenue for a period of one year due to damage to real property or personal property resulting from a discharger. The Legislature considered the problems of revenue losses to municipalities. It made no exception to any claim for priority under N.J.S.A. 58:10-23.11f(f). *314 Compare the language of the New York statute quoted from the opinion in Thornton v. Chase, supra, 23 N.Y.S.2d at 738.
A municipality has no claim under the Constitution against its creator. Trenton v. New Jersey, 262 U.S. 182, 187, 43 S.Ct. 534, 67 L.Ed. 937 (1922). In Irvington v. Ollemar, 128 N.J. Eq. 402 (Ch. 1940), the court said:
... The tax sale law states that every municipal lien shall be paramount to all prior or subsequent alienations or encumbrances except subsequent municipal liens. R.S. 54:5-9. But these general words do not operate to subordinate a prior lien held by the state. Trustees of Public Schools v. Trenton, 30 N.J. Eq. 618; affirmed, Id. 667, 683. The state's lien for inheritance tax is superior to municipal liens which accrued after the death of Mrs. Ollemar. Berry-Schilling, Inc. v. Shuster, 122 N.J. Eq. 256; Bowes v. United States, 127 N.J. Eq. 132. The order of priority stated above is not affected by R.S. 54:5-9. [at 409]
The court concludes that the lien of the Administrator under N.J.S.A. 58:10-23.11f(f) has priority over Paterson's lien under N.J.S.A. 54:5-9.
NOTES
[1] Administrator's lien arises from action taken in State of New Jersey, Department of Environmental Protection, and City of Paterson v. Barone Hazardous Waste Management Corporation, a New Jersey corporation; Barone Barrel and Drum Co., a proprietorship, Daniel Tarrats and Albert Tarrats, jointly, severally and individually, Superior Court of New Jersey, Chancery Division, Passaic County, Docket C-732-81.

On November 9, 1979 an insurance company docketed a judgment in the amount of $399.17 against Foam Craft, Inc. It has filed an answer but has not participated in these motions.
On December 18, 1981 Daniel Tarrats executed a mortgage on the subject premises to a firm of attorneys, which mortgage was recorded on December 28, 1981. They have filed an answer. They have not taken any position on the lien of said mortgage.
The court was informed that another mortgage given by Daniel Tarrats on June 12, 1980 to a savings and loan association which was recorded and listed in the complaint has been paid off after an answer was filed by said savings and loan association. The latter has taken no action in respect to these motions.
[2] By L. 1979, c. 286, the Legislature changed those results in respect to notes secured by mortgages in certain transactions not applicable to this case. Cf. N.J.S.A. 2A:50-2.3. This court construes the reference in N.J.S.A. 2A:50-22 to "notes" to mean notes specified in N.J.S.A. 2A:50-2.3.

If the holder of a note secured by a mortgage chooses not to foreclose the mortgage first but to sue on the note, obtain judgment, and execute and levy on the judgment to reach the real estate, as suggested above, he might be thwarted if the judgment debtor had personal property. N.J.S.A. 2A:17-1 requires that a sheriff first levy on personal property and then real estate. See Raniere v. I. & M. Investments, Inc., 159 N.J. Super. 329 (Ch.Div. 1978), aff'd 172 N.J. Super. 206 (App.Div. 1980). If the execution sale produced a sufficient amount, the debt would be satisfied and the mortgage would have to be released.
However, whether he foreclosed the mortgage first or obtained judgment and ultimately levied execution, there is no statute that requires him to offset the fair market value of the real estate if he is the successful bidder when suing for a deficiency.
[3] In a prior decision involving the same parties, Lyford v. New York, 140 F.2d 840, 843-844 (2 Cir.1944), Judge Clark held valid the statute giving the State of New York "a first and paramount lien upon all real property of such railroad corporation or corporations" as applied against mortgages given before the enactment of the statute creating the lien.

Judge Clark traced the history in the reported decisions in the courts of New York sustaining the power of that State to prefer its debts over the debts of unsecured creditors. This power was traced to the power of the sovereign in Great Britain to do that. That power was part of the common law as adopted after the Revolution. The subject statute was but an express exercise of the power to overcome prior liens. Judge Clark also based its validity upon the legislature's exercise of the police power. There is some doubt as to whether this court should now hold that the Legislature exercised the power derived from the sovereign by the enactment of the statute giving the State a prior lien. Cf. Middlesex Cty. Freeholders v. State Bank of New Brunswick, 29 N.J. Eq. 268 (Ch. 1878), aff'd o.b. 30 N.J. Eq. 311 (E. & A. 1878). There, the Attorney General of New Jersey urged the existence of the State's common-law right of preference. The Chancery Court said:
If, by the adoption of the common law, New Jersey became invested with this right, it holds it now in all it original force, and may wield it to-day in all its iron rigor. It has not been changed or mitigated by legislation  indeed, it is unknown and in the legislation of the state  and if it exists at all, it is held as perfect and complete as it existed in the hands of George III. Statutes regulating private rights, or ameliorating private remedies, do not extend to the king (1 Black Com. 261); nor to the state (O'Hanlon [O'Hanlin] v. Van Kleeck Spen. [20 N.J.L.] 31, 40; S.C. in error, 1 Zab. 582, 589). When a statute is general, and thereby any prerogative, right, title or interest is divested or taken from the king, in such case the king shall not be bound, unless the statute is made to extend to him by express words. Bac.Abr., title Prerogative E. 5. If the right exists here, it is untouched by either constitutional or statutory regulation.
... It certainly has never received judicial approval, and, so far as my knowledge extends, no law officer of the state has ever attempted to enforce it. For over one hundred years as an actual, practical prerogative of government, it has neither been exerted nor recognized, and this circumstance, as a matter of contemporaneous and long-continued construction by all departments of the government, would seem to negative the existence of the right with great emphasis. A prerogative which has remained so long practically useless can hardly be said to exist. [29 N.J. Eq. at 270-271]
After citing opinions from courts of other states, the court said:
It was held, the state simply acquired the preeminent right, without the writ of protection or extent, and could only enforce the right by such remedies as the citizen was at liberty to employ. By what means these incidents were lost is not stated. I think it would be quite difficult to show how they were lost. Unless altered by legislation, I think if the right is admitted at all, it must be allowed to stand in all its original rigor. But, what is more pertinent to the question in hand, it was also held in this case, that any act which divests the title of the debtor and puts his property in the hands of others for the benefit of his creditors, cuts out the right of the state. [Id. at 273]
The court decided the case on the ground that the appointment of a liquidating receiver deprived the State of its right if it could exist without a statute to support it.
The position of the New Jersey court is recognized as that of a minority of the courts in the United States. See Annotation, "State's Prerogative Right of Common Law Preference," 51 A.L.R. 1355 (1927), supplemented 65 A.L.R. 1331 (1930), 90 A.L.R. 184 (1934) and 167 A.L.R. 640 (1947); cf. In re Carnegie Trust Co., 151 App.Div. 606, 136 N.Y.S. 466, 469 (App.Div.), aff'd 206 N.Y. 390, 99 N.E. 1096 (1912). See, generally, 81A C.J.S., States, § 152 (1977).
Although the statements quoted above from the trial court opinion in State Bank, supra, about the existence of the right in New Jersey are dicta, and hence not controlling, the importance of the policy should be determined by either a higher court or the Legislature following this long period of silence. There is a more abundant history and development of the concept than is reflected in the decision in State Bank, supra.
In Third Ave. B. & L. Ass'n v. Prothero, 124 N.J. Eq. 193 (Ch. 1933), the court said that the Legislature has the power to declare in a statute enacted after a mortgage is recorded that the lien to secure taxes imposed by such statute have priority. However, the court construed that statute as not expressly giving that priority.
[4] The mortgage instrument between Carshel and 190-16th Avenue Corp. contains no covenants other than one to pay the debt. For this reason there is not found the covenant frequently found in mortgages stating:

That the mortgagor shall not use or permit use of the mortgaged premises for any purpose forbidden by law and that the mortgagor shall comply with any laws, orders, regulations, ordinances, or requirements of the Federal, State, County or Municipal Government ... having jurisdiction over their premises.
See 29 N.J.Practice (Cunningham & Tischler, Mortgages), § 23 (1975). The fact that Paterson had acquired a tax certificate indicates that those associated with the mortgage were not paying close attention to the property. Kessler averred that he did not know that Tarrats was on the premises "until the State started the clean-up proceedings."
The record in the main case shows that neither DEP nor the PUC issued any license to Tarrats or anyone else to operate a disposal site at the subject premises. He was only licensed to haul between approved points.
This is not a situation where some stranger in the dark of night dumped toxic waste on the land subject to a mortgage.
All associated with the mortgage had an interest in seeing that the debt was paid or the person in possession ousted. In such a situation any one of them would have a right to claim that the security was being or would be destroyed and to obtain an injunction. Cf. Fidelity Trust Co. v. Hoboken and Manhattan R. Co., 71 N.J. Eq. 14 (Ch. 1906); 29 N.J.Practice, op. cit., § 161 at 715-718. However, the owner of the land who wakes to find his or her field strewn with leaking drums has no such relief available.